IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JOB GOLIGHTLY, on behalf of himself and all
others similarly situated,

                                   Plaintiff,

        v.

UBER TECHNOLOGIES, INC., and
CHECKR, INC.,

                                   Defendants.

**CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

Plaintiff Job Golightly, on behalf of himself and all others similarly situated, alleges,

upon personal knowledge and upon information and belief as to other matters, as follows:

## <u>INTRODUCTION</u>

1.      Uber, the largest rideshare company in the world, has operated in New York City,

its largest domestic market, since 2011.

2.      This class action lawsuit challenges Uber's unlawful use of criminal history to

discriminate against its drivers in New York City as well as its brazen noncompliance with

human rights and fair credit laws.

3.      Checkr, a consumer reporting agency used by Uber to obtain drivers' criminal

history through backgrounds checks, is Uber's willing partner in this unlawful conduct.

4.      Uber's criminal history discrimination has fueled and continues to fuel significant

racial disparities in New York City and nationwide.

5.      Uber has dominant market share in New York City, with its labor platform

hosting approximately 70% of the application-based on-demand rides that occur in the City.

6.      Since its founding, Uber has classified its drivers as independent contractors, leaving its driver workforce vulnerable to discrimination and exploitation, and without the protection of city, state, and federal civil rights laws.

7.      To address this gap in protection, the New York City Council amended the New York City Human Rights Law (NYCHRL) in November 2019 to encompass independent contractors such as Uber drivers within its expansive protections against discrimination and unfair treatment.[1]  That amendment became effective and binding on companies, including Uber, on January 11, 2020.

8.      These NYCHRL protections include the Fair Chance Act, which, *inter alia*, requires employers to evaluate job seekers and current workers with criminal histories fairly and on a case-by-case basis.[2]

9.      The Fair Chance Act has been a critical tool for advancing racial justice and reducing barriers to opportunity.  Employment discrimination based on criminal history has a particularly outsized impact in communities of color, which have long been over-criminalized and face disproportionally higher rates of criminal history and incarceration.[3]

10.     Plaintiff Job Golightly is a Black resident of the Bronx who has been licensed by the New York City Taxi and Limousine Commission (TLC) since 2014 as a For-Hire-Vehicle

---

[1]      *See* N.Y.C. Admin. Code § 8-107(23) ("The protections of this chapter relating to employees apply to interns, freelancers and independent contractors.") (effective date Jan. 11, 2020).

[2]      *See* N.Y.C. Admin. Code § 8-107(10)(a); Fair Chance Act: Legal Enforcement Guidance, *available at*: https://www1.nyc.gov/site/cchr/law/fair-chance-act.page (expansively defining "Applicant" to include both potential and current employees) (last visited April 8, 2021).

[3]      Devah Pager et al., *Discrimination in a Low-Wage Labor Market: A Field Experiment*, 74 Am. Soc. Rev. 777, 785-86 (2009); Devah Pager et al., *Sequencing Disadvantage: Barriers to Employment Facing Young Black and White Men with Criminal Records*, 623 ANNALS AM. ACAD. POL. & SOC. SCI 195, 199 (2009); Devah Pager, *The Mark of a Criminal Record*, 108 AM. J. SOC. 937, 955-61 (2003).

(FHV) driver.  Mr. Golightly has driven for Uber since 2014, working 50-60 hours a week, on average, and earning, on average, approximately $1,500 per week.

11.     In August 2020, Uber used Checkr to obtain Mr. Golightly's background check, which revealed a 2013 speeding ticket in Virginia characterized as a misdemeanor.  If Mr. Golightly had received the same speeding ticket in New York, it would not have been characterized as a misdemeanor.

12.     One day later, due to the results of this background check, and without any notice, process, or further communication, Uber deactivated Mr. Golightly from the Uber labor platform, depriving him of the ability to drive for Uber and earn income.

13.     Uber used the results of Mr. Golightly's background check, specifically his criminal history, for employment purposes, by using it as a basis for deactivating him from the platform. Uber deactivated Mr. Golightly without engaging at all in the Fair Chance Act process, which incorporates Article 23-A of the New York State Corrections Law.

14.     The Fair Chance Act process requires individualized analysis under Article 23-A and its multi-part factors, the provision of required documents and disclosures, and a waiting period in which the employer must keep the position open for the applicant or current worker to respond to the employer's concerns about any criminal history that appears on the background check.

15.     Uber did none of these things.

16.     Only several months later, after Mr. Golightly complained to Uber and Checkr about his unfair treatment, did Checkr provide him with information about why Uber had barred him from the platform, specifically citing the 2013 Virginia misdemeanor.

17.     Uber's unlawful policy of using criminal history to summarily deactivate current drivers from its labor platform or reject new drivers without even attempting to comply with the Fair Chance Act process also disparately impacts hundreds of Black and Latinx individuals, like Mr. Golightly, who drove or hoped to drive for Uber, and who have disproportionately higher rates of criminal history due to the overcriminalization of communities of color.  Uber's conduct accordingly violates the disparate impact provision of the NYCHRL, N.Y.C. Admin. Code § 8-107(17).

18.     Uber's policy of wholesale noncompliance with the Fair Chance Act process imports the significant racial disparities in the criminal justice system into its driver applicant and retention process, causing a disparate impact on Black and Latinx current and prospective drivers in New York City with criminal histories.

19.     Uber and Checkr also deliberately failed to comply with the requirements of the federal Fair Credit Reporting Act (FCRA) and its New York analogue, the New York State Fair Credit Reporting Act (NY FCRA), which impose an additional set of disclosure, notice, and certification requirements on companies that obtain and use consumer reports to take adverse action against applicants or current workers.

20.     Mr. Golightly did not receive from Uber any of the notices or disclosures required by these statutes.

21.     Current and potential Uber drivers with criminal histories are being deprived of crucial notice, information, and process that would permit them to explain their criminal histories, correct inaccurate or incomplete information, and otherwise challenge Uber's policy of barring them from its labor platform due to that criminal history.

4

22.     Uber and Checkr's policies and practices have unlawfully imposed barriers to opportunity on Uber's driver workforce that have a significant racial impact.

23.     Plaintiff accordingly brings claims on behalf of himself and all others similarly situated against Uber under the NYCHRL, FCRA, and NY FCRA, and against Checkr under the FCRA.

## JURISDICTION AND VENUE

24.     The Court has jurisdiction over Plaintiff's FCRA claims under both 15 U.S.C. § 1681p, which permits FCRA claims to be brought in any "court of competent jurisdiction," and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over Plaintiff's NYCHRL and NY FCRA claims under 28 U.S.C. § 1367.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

26.     At the same time he files this Complaint, Plaintiff will send a copy of the Complaint to the New York City Commission of Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of N.Y.C. Admin. Code § 8-502.

## PARTIES

### Plaintiff Job Golightly

27.     Plaintiff Job Golightly is a 44-year-old resident of Bronx County, New York.

28.     Mr. Golightly is a Black man.

29.     Mr. Golightly's criminal history consists of a single 2013 misdemeanor speeding violation from Virginia.

30.     In 2014, Mr. Golightly applied for a TLC license to be a FHV driver.  As part of the TLC application, TLC conducted a background back on him.  Mr. Golightly obtained a TLC license in 2014.

31.     Mr. Golightly drove for Uber from approximately 2014 through August 27, 2020.

**Defendants**

32.     Defendant Uber Technologies, Inc. is a California corporation headquartered in San Francisco, California with offices located in New York City.

33.     Uber regularly conducts business in New York City and hires tens of thousands of independent contractors in New York City to drive for the company through its labor platform.

34.     Defendant Checkr, Inc. is a California corporation headquartered in San Francisco, California.

35.     Checkr regularly conducts business in New York City.

36.     Since 2017, Uber has sought consent from tens of thousands of drivers in New York City for background checks performed by Checkr and has used the results of those reports in connection with deciding whether to permit drivers to access or continue to access its labor platform.

**STATUTORY BACKGROUND**

**NYCHRL**

37.     The NYCHRL prohibits discrimination in New York City, in employment, housing, and public accommodations, and protects against discriminatory lending practices, retaliation, discriminatory harassment, and bias-based profiling by law enforcement.

38.      The law emphasizes that "there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one

another and antagonistic to each other because of their actual or perceived differences, including those based on . . . conviction or arrest record." N.Y.C. Admin. Code § 8-101.

39.      Accordingly, "[t]he public policy of [New York City], as expressed and incorporating [the Correction Law], [is] to encourage the licensure and employment of persons previously convicted of one or more criminal offenses." N.Y.C. Admin. Code § 753.

40.      For these reasons, the NYCHRL forbids most employers in New York City from asking about the criminal history of current employees and of job applicants, including independent contractors, before making a job offer. This legal regime allows current employees and applicants to be judged on their qualifications alone.

41.      If, after a job offer or employment, an employer wants to revoke the offer—or terminate employment—based on the existence of a criminal record, the employer must explain why, using the Fair Chance Act Notice (or equivalent Article 23-A analysis), provide a copy of any background check conducted by the employer or third-party vendor, and give the applicant three business days to respond after receipt of these documents.[4] Employers must also provide individuals with a copy of the consumer report on which the employer relied.

42.      An employer may deny employment only where there is (a) a "direct relationship" between the criminal history and the "specific license or employment sought or held by the individual," or (b) "the issuance or continuation of the license or the granting or continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public." N.Y. Correc. Law § 752.

---

[4]      *See* Fair Chance Act Notice, *available at*:
https://www1.nyc.gov/assets/cchr/downloads/pdf/FairChance_Form23-A_distributed.pdf (last visited April 8, 2021).

43.     The employer must, in making this determination, engage in an individualized analysis and explicitly consider eight factors:

      a.  That New York public policy encourages the licensure and employment of people with criminal records;

      b.  The specific duties and responsibilities of the prospective job;

      c.  The bearing, if any, of the person's conviction history on her or his fitness or ability to perform one or more of the job's duties or responsibilities;

      d.  The time that has elapsed since the occurrence of the events that led to the applicant's criminal conviction, not the time since arrest or conviction;

      e.  The age of the applicant when the events that led to her or his conviction occurred, not the time since arrest or conviction;

      f.  The seriousness of the applicant's conviction history;

      g.  Any information produced by the applicant, or produced on the applicant's behalf, regarding her or his rehabilitation or good conduct; and

      h.  The legitimate interest of the employer in protecting property and the safety and welfare of specific individuals or the general public.  *Id.* § 753.

**FCRA**

44.     The FCRA requires that "before taking any adverse action based in whole or in part on [a consumer report]," the employer intending to take the adverse action must provide "the consumer to whom the report relates" with a pre-adverse action notice informing the consumer that the employer intends to take adverse action based on the consumer report and enclosing "(i) a copy of the report, and (ii) a description in writing of the rights of the consumer under this subchapter."  15 U.S.C. § 1681b(b)(3)(A)(i)-(ii).

45.     The FCRA defines adverse action as either "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee,"

8

or "an action taken or determination that is . . . adverse to the interests of the consumer." 15 U.S.C. § 1681a(k)(1)(B).

46.     When used in connection with a consumer report, "for employment purposes" means a report that is used "for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee."  15 U.S.C. § 1681a(h).

47.     According to the United States Federal Trade Commission, which has primary enforcement authority for FCRA, "for employment purposes is interpreted liberally to effectuate the broad remedial purpose of the FCRA."[5]  Accordingly, "it may apply to situations where an entity uses individuals who are not technically employees to perform duties," such as a trucking company that obtains consumer reports on individual drivers who own and operate their own equipment; a title insurance company that obtains consumer reports on individuals with whom it frequently enters into contracts to sell its insurance, examine title, and close real property transactions; or a nonprofit organization staffed in whole or in part by volunteers."[6]

48.     The FCRA also requires any company actually taking adverse action against an applicant to provide them a written adverse action notice, which must inform the consumer that adverse action has been taken based on information found in a consumer report, and must also include the following: (i) contact information for the consumer reporting agency that provided the consumer report; (ii) a statement that the consumer reporting agency is not the party taking the adverse action and cannot supply a reason for the adverse action; (iii) notice of the

---

[5]     Federal Trade Commission, 40 Years of Experience with the Fair Credit Reporting Act, An FTC Staff Report With Summary of Interpretations, at 32 (2011), *available at*: https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf (last visited April 8, 2021).

[6]     *Id.*

applicant's right to obtain a second report, free of charge, from that same consumer reporting agency within a time period not to exceed 60 days; and (iv) a disclosure of the applicant's rights under the FCRA, including the right to dispute the information contained in the consumer report, relative to accuracy and completeness.  15 U.S.C. § 1681m(a).

49.     The FCRA also states that a consumer reporting agency may only furnish a consumer report if the person who obtains such report from the agency certifies to the agency that the person has complied with paragraphs (2) and (3) of 15 U.S.C. § 1681b(b) with respect to the consumer report, and that information from the consumer report will not be used in violation of any applicable Federal or State equal employment opportunity law or regulation.  15 U.S.C. § 1681b(b)(1)(A)(i)-(ii).

**NY FCRA**

50.     Under New York's version of FCRA, when a consumer reporting agency provides a consumer report that contains criminal conviction information to a corporation, that corporation must provide the subject of such report a printed or electronic copy of Article 23-A governing the licensure and employment of persons previously convicted of one or more criminal offenses.  N.Y. Gen. Bus. Law § 380-g(d).

51.     The NY FCRA also requires that all users of such information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose.  *Id.* § 380-k.

## STATEMENT OF FACTS

52.     Founded in 2009, Uber provides on-demand automobile transportation in over 10,000 cities globally.  It allows customers to request and pay for car services via a mobile phone

application.  Uber claims that it is "building a culture . . . that emphasizes doing the right thing, period, for riders, drivers, and employees."

53.     On April 25, 2014, Uber announced a new "three-step" background check policy consistently applied across all Uber products that included county, federal, and multi-state background checks.

54.     From that date until 2017, in New York City, Uber relied solely on the background checks conducted by the TLC.  In mid-2017, Uber began using Checkr to conduct an additional background check on current drivers and prospective drivers after receiving negative news coverage of a spate of assaults committed by drivers.[7]

55.     Founded in 2014, Checkr is a corporation that regularly engages in the practice of assembling or evaluating information on consumers for the purpose of furnishing consumer reports to third parties such as Uber.

56.     Uber uses these consumer reports, including information about any criminal history contained within, for employment purposes, i.e., to determine the eligibility of current Uber drivers to continue driving for Uber and the eligibility of individuals to begin driving for Uber.

**Plaintiff Golightly**

57.     Mr. Golightly is a Black resident of the Bronx.

58.     In September 2013, Mr. Golightly received a speeding ticket in Virginia after exceeding the applicable maximum speed limit by 22 miles per hour, which under Virginia law

---

[7]     Maya Sheppard, *Getting Fired by an App: The Shifting Legal Landscape of Criminal-Records-Based Exclusions from "Transportation-Network Companies" in Washington, D.C.*, GEO. J. ON POVERTY L. & POL'Y (2018).

was a misdemeanor.  Under New York law, exceeding the applicable maximum speed limit by 22 miles per hour is only a civil infraction, not a misdemeanor.

59.      Mr. Golightly's entire criminal history consists of that Virginia speeding violation misdemeanor.

60.      Mr. Golightly sought a TLC FHV license in 2014 and his background was checked as part of that application.  The TLC issued him a license in 2014.

61.      After he obtained his TLC license, Mr. Golightly applied to drive for Uber.  In 2014, Uber accepted his application.

62.      Mr. Golightly drove for Uber from 2014 through August 2020, driving, on average, 50-60 hours per week and earning, on average, $1,500 per week.

63.      On or around August 27, 2020, Uber sought Mr. Golightly's consent to conduct a background check via Checkr.  Uber provided two options for Mr. Golightly's consent: "Accept" or "Decline."  Mr. Golightly accepted and provided consent.  Had he not provided consent, Mr. Golightly would have been barred from access to Uber's labor platform.

64.      After Mr. Golightly authorized the check, Checkr obtained his consumer report, including his criminal history, and provided it to Uber.  One day later, on or around August 28, 2020, without any notice, process, or communication, Uber deactivated Mr. Golightly from its labor platform, preventing him from finding Uber passengers to drive and earning an income.

65.      Mr. Golightly only learned several months later that this background check revealed the 2013 speeding violation misdemeanor in Virginia.

66.      Before Uber deactivated Mr. Golightly, it did not conduct an Article 23-A analysis or provide him with any of the documents required by the NYCHRL, including a written

copy of the analysis or his background check.  Uber also failed to provide Mr. Golightly with a

pre-adverse action notice and accompanying documents, or an adverse action notice.

67.     Even after Uber deactivated Mr. Golightly from its labor platform, it did not

provide him a copy of any of the required documents under the NYCHRL, FCRA, or NY FCRA,

or engage in the Article 23-A individualized analysis required by the Fair Chance Act.

68.     Mr. Golightly has still not received a copy of any of the documents required by

the Fair Chance Act provisions of the NYCHRL.

69.     Mr. Golightly has still not received a copy of his consumer report from either

Uber or Checkr.

70.     Mr. Golightly has still not received a written description of his rights under FCRA

or NY FCRA.

71.     Checkr distributed Mr. Golightly's consumer report to Uber without obtaining

any of the required certifications from Uber that it would comply with the disclosure provisions

of the FCRA.  This unlawful distribution invaded Mr. Golightly's privacy and caused him harm.

72.     Mr. Golightly and the proposed Class Members he seeks to represent are

"consumers" as defined by the FCRA and NY FCRA and are each a "person" within the

meaning of the NYCHRL and are covered by the NYCHRL's protections, including the Fair

Chance Act.

73.     During the relevant period, Mr. Golightly resided at the same address, which was

known to Uber and Checkr.  Uber and Checkr also had Mr. Golightly's email address and phone

number, which did not change during the relevant period.

**Disparate Impact Allegations**

74.      The Fair Chance Act has been a critical tool to reduce the significant employment

barriers to those with a criminal history, which disparately affects Black and Latinx individuals.

75.      According to a report from The Sentencing Project, "[i]n 2010, 8% of all adults in

the United States had a felony conviction on their record," but, among Black men, "the rate was

one in three [or 33%]."[8]

76.      Nationwide, Black Americans make up only 12.6% of the general population but

constitute 27% of all arrests.[9]   Nearly 60% of incarcerated prisoners nationwide are Black or

Latinx while they together constitute less than 30% of the U.S. population.[10]

77.      In New York State, Black residents constitute approximately 16% of the

population but 53% of the incarcerated population.[11]  Latinx residents constitute 18% of the state

population, but 22% of the incarcerated population.[12]

78.      Accordingly, "when employers use criminal background checks to

indiscriminately disqualify all applicants with criminal records, these employers severely curtail

---

[8]      Report of The Sentencing Project to the United Nations Special Rapporteur on
Contemporary Forms of Racist, Racial Discrimination, Xenophobia, and Related Intolerance:
Regarding Racial Disparities in the United States Criminal Justice System, The Sentencing
Project (2018), at 9, *available at*: https://www.sentencingproject.org/publications/un-report-on-
racial-disparities/ (last visited April 8, 2021).
[9]      E. Ann Carson, Ph.D., *BJS Statistician*, Prisoners in 2016, U.S. Department of Justice
Office of Justice Programs, Bureau of Justice Statistics (Updated August 7, 2018), *available at*:
https://www.bjs.gov/content/pub/pdf/p16.pdf (last visited April 8, 2021).
[10]      Leah Sakala, *Breaking Down Mass Incarceration in the 2020 Census: State-by-State
Incarceration Rates by Race/Ethnicity*, PRISON POL'Y INITIATIVE (May 28, 2014).
[11]      *See* Prison Policy Initiative, Racial and ethnic disparities in prisons and jails in New
York, compiled from 2010 census data, *available at*:
https://www.prisonpolicy.org/graphs/disparities2010/NY_racial_disparities_2010.html (last
visited April 8, 2021).
[12]      *Id.*

14

employment opportunities for formerly incarcerated people."[13]  And "[b]ecause [B]lack and Latino individuals are likelier to have criminal records than white and Asian people . . . [B]lack and Latino males are disproportionately affected by criminal background checks."[14]

79.    In New York City, where city residents are 43% white, 24% Black, and 29% Latinx,[15] people of color are disproportionately arrested.  Since January 2014, Black city residents have constituted 48% of all arrests and Latinx city residents have constituted 34%, while white city residents have constituted 12% of arrests.[16]

80.    The gig economy workforce in New York City is also primarily low-income persons of color: 87% of individuals engaged as independent contractors in transportation (primarily for Uber and Lyft) are persons of color, 81% lack a college degree, and 90% are foreign-born.[17]

81.    Accordingly, a transportation company such as Uber using an independent contractor workforce that discriminates based on criminal history against New York City residents will cause a significant disparate race impact due to differences in New York State and City arrest and conviction rates between white resident and Black and Latinx residents.

---

[13]    U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019) at 42, available at: https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf (last visited April 8, 2021).

[14]    *Id.*

[15]    2019 Census QuickFacts, available at: https://www.census.gov/quickfacts/newyorkcitynewyork (last visited April 8, 2021).

[16]    ABC News, *Blacks account for nearly half of all NYC arrests 6 years after end of stop-and-frisk: NYPD data*, June 30, 2020, available at: https://abcnews.go.com/US/blacks-account-half-nyc-arrests-years-end-stop/story?id=71412485 (last visited April 8, 2021).

[17]    The New School Center for New York City Affairs, *The Magnitude of Low-Paid Gig and Independent Contract Work in New York State* (February 2020), at 14, *available at*: https://static1.squarespace.com/static/53ee4f0be4b015b9c3690d84/t/5e424affd767af4f34c0d9a9/1581402883035/Feb112020_GigReport.pdf (last visited April 8, 2021).

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action as a proposed class action under Rule 23 of the Federal

Rules of Civil Procedure on behalf of the following two classes (collectively, "Class Members"):

> **Criminal History Discrimination and Notice Class**:  All individuals
> who, since January 11, 2020: (i) have had their consumer reports obtained
> by Checkr and used by Uber in connection with driving for Uber in New
> York City; (ii) were then denied the opportunity to drive for Uber based in
> whole or in part on criminal history contained in those consumer reports;
> and (iii) who did not receive a pre-adverse action notice, an adverse action
> notice, a copy of their consumer report, a written description of their rights
> under FCRA, a written copy of Article 23-A, or a copy of Uber's Article
> 23-A analysis of their criminal history.

> **Disparate Impact Class**:  All Black and Latinx individuals, who, since
> January 11, 2020, have had their consumer reports used by Uber in
> connection with driving for Uber in New York City, and who were then
> denied the opportunity to drive for Uber based in whole or in part on
> criminal history contained in those consumer reports.

83.     The Class Members are so numerous that joinder of all members is impracticable.

There are approximately 80,000 TLC-licensed vehicles in New York City that can be hailed with

rideshare applications, the majority of which are hailed using Uber.  Uber's policy is to conduct

background checks on its current drivers at least every two years, using Checkr[18] and potentially

other companies, as well as checks on prospective drivers.  The precise number of Class

Members is uniquely within the Defendants' possession and may be identified using objective

factors, including a database of current and prospective drivers in New York City for whom Uber

has engaged Checkr to obtain their consumer reports.  Without the benefit of discovery, Plaintiff

estimates that the Criminal History Discrimination and Notice Class numbers at least 1,000 and

---

[18]     CNN, *Uber tightens driver background checks*, April 12, 2018, *available at*:
https://money.cnn.com/2018/04/12/technology/uber-safety-update/index.html (last visited April
8, 2021).

the Disparate Impact Class numbers at least 300.  Class Members may be notified of the

pendency of this action by mailed and emailed notice.

84.     There are questions of law and fact common to Class Members, and these

questions predominate over any questions affecting only individual members.  Common legal and

factual questions include whether:

    a.  Uber has violated and continues to violate the NYCHRL by failing to conduct in the first instance the individualized Article 23-A analysis incorporated into the Fair Chance Act before barring Class Members from its labor platform based on criminal history contained within their background checks;

    b.  Uber has violated and continues to violate the Fair Chance Act provisions of the NYCHRL by failing to provide Members of the Criminal History Discrimination and Notice Class with a written copy of their background check or Article 23-A analysis (or Fair Chance Act Notice);

    c.  Uber has violated and continues to violate the Fair Chance Act provisions of the NYCHRL by failing to hold the positions of Members of the Criminal History Discrimination and Notice Class open for at least three business days from the date of Class Members' receipt of the documents required by the Fair Chance Act;

    d.  Uber's policy of barring Members of the Disparate Impact Class from its labor platform based on their criminal history without even attempting to comply with the Fair Chance Act provisions of the NYCHRL had and has a disparate impact on Black and Latinx individuals in New York City.

    e.  Uber has violated and continues to violate the FCRA by failing to require the provision of pre-adverse action and adverse action notices, including copies of consumer reports and written descriptions of FCRA rights as well as other required disclosures to Members of the Criminal History Discrimination and Notice Class against whom Uber intends to take or has taken adverse action based on criminal history information contained in their background checks;

    f.  Uber has violated and continues to violate the NY FCRA by failing to require the provision of a copy of Article 23-A of the Correction Law to Members of the Criminal History Discrimination and Notice Class against whom Uber intends to take or has taken adverse action based on criminal history information contained in their background checks;

    g.  Checkr has violated and continues to violate the FCRA by failing to obtain Uber's certification that it has complied and will comply with the disclosure

requirements of the FCRA with respect to the consumer reports of Members of the Criminal History Discrimination and Notice Class that it has provided and will provide to Uber;

h.   Defendants' violations of the FCRA were willful;

i.   A declaratory judgment and/or injunctive relief is warranted regarding Defendants' conduct;

j.   Statutory penalties are warranted under the FCRA;

k.   Compensatory, exemplary, nominal and/or punitive damages are warranted under the NYCHRL, FCRA, and NY FCRA; and

l.   Attorney's fees and costs are warranted under the NYCHRL, FCRA, and NY FCRA.

85.    Plaintiff's claims are typical of the claims of both classes he seeks to represent in that, in the relevant period: (1) Plaintiff drove for Uber in New York City; (2) Plaintiff is a Black man; (3) Plaintiff has a criminal history; (4) Uber sought Plaintiff's consent for a background check to be conducted by Checkr; (5) Checkr provided Plaintiff's consumer report to Uber without obtaining Uber's certification that it would comply with the FCRA; (6) Uber used the criminal history contained in the background check to bar Plaintiff's access to its labor platform; (7) Uber failed to provide Plaintiff with any of the required notice, disclosures, or process as required by the NYCHRL, FCRA, and NY FCRA; and (8) Uber failed to conduct any Article 23-A analysis before taking adverse action against Plaintiff by barring him from its labor platform.

86.    Plaintiff's claims therefore arise from the same practice or course of conduct that forms the basis of the Class Members' claims.  There is no antagonism between the interests of Plaintiff and those of the Class Members.  Plaintiff's injuries, including being unable to earn income because he is barred from Uber's labor platform, having his privacy invaded, and not being given disclosure, notice, and process as required by the NYCHRL, FCRA, and NY FCRA, are injuries similar to the injuries that Class Members have suffered.

87. Plaintiff will fairly and adequately represent both proposed classes. There is no conflict between Plaintiff's claims and those of the Class Members. Plaintiff has retained counsel skilled in complex class actions and who will vigorously prosecute this litigation.

88. Class certification is appropriate for the proposed class under Rule 23(b)(2) because Uber and Checkr have acted or refuse to act on grounds generally applicable to both classes, making appropriate declaratory and injunctive relief with respect to Plaintiff and both classes. Specifically, Uber has obtained and used and continues to obtain and use background checks, including those provided by Checkr, for employment purposes for current and prospective Uber drivers in violation of the NYCHRL, FCRA, and NY FCRA. Plaintiff and Class Members will seek Defendants' compliance with these statutes by, *inter alia*, providing current and prospective drivers the required notices and process in connection with the use of background checks and by engaging in the required individualized analysis where Uber uses background checks to determine access and remain connected to its labor platform. Plaintiff and Class Members are accordingly entitled to declaratory and injunctive relief to end Defendants' conduct in violation of the NYCHRL, FCRA, and NY FCRA.

89. Class certification is also appropriate under Rule 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual Class Members. Plaintiff and Class Members have been damaged and are entitled to recovery because of Defendants' willful conduct in violation of the NYCHRL, FCRA, and NY FCRA. Plaintiff and Class Members seek statutory penalties under the FCRA, which range from $100 to $1,000 per violation, as well as compensatory, punitive, and nominal damages.

90. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. The

prosecution of separate actions by individual Class Members would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the proposed class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
**(Uber's Per Se Violations of the NYCHRL)**
**(Brought by Plaintiff on Behalf of Himself and the**
**Criminal History Discrimination and Notice Class)**

91.     Plaintiff, on behalf of himself and the Class Members, incorporates by reference all preceding paragraphs.

92.     The NYCHRL, N.Y.C. Admin. Code § 8-107(11-a)(b)(i)-(iii), requires that Uber, before terminating employment with current drivers or declining employment to applicant drivers in New York City based in whole or in part on their criminal history, (a) perform an Article 23-A individualized analysis; and (b) provide those drivers with: (i) a written copy of their background check containing that criminal history, and (ii) a written copy of the Article 23-A analysis (or equivalent Fair Chance Act Notice), including any supporting documents that formed the basis for the adverse action.  After giving current or applicant drivers the required documents above, Uber must then give them no less than three business days to respond while holding the position open.  *Id.*

93.     Uber failed to perform an individualized Article 23-A analysis as to Plaintiff and failed to provide him with any of the required documents, including written copies of his background check or Article 23-A analysis.  Uber also failed to keep Plaintiff's driver position

open for at least three business days after providing him the required documents so that he would have an opportunity to respond.

94.    It is an independent per se violation of the Fair Chance Act provisions of the NYCHRL for Uber to bar Plaintiff from its labor platform based on his criminal history before completing the Fair Chance Act process, as outlined above.

95.    It is an additional independent per se violation of the Fair Chance Act provisions of the NYCHRL for Uber to fail to provide to Plaintiff with a written copy of the background check it used to determine whether to bar him from its labor platform.

96.    It is an additional independent per se violation of the Fair Chance Act provisions of the NYCHRL for Uber to fail to provide to Plaintiff with a written copy of the Article 23-A analysis it should have conducted but failed to conduct.

97.    It is an additional independent per se violation of the Fair Chance Act provisions of the NYCHRL for Uber to fail to keep Plaintiff's position open for at least three business days after providing him the required documents.

98.    By failing to do any of these things, Uber has committed four independent per se violations of the Fair Chance Act provisions of the NYCHRL against Plaintiff.

99.    Uber took adverse action against Plaintiff and Members of the Criminal History Discrimination and Notice Class by barring them from its labor platform based in whole or in part on their criminal history without complying in any respect with the NYCHRL.

100.    As a result of Uber's actions, Plaintiff and the proposed class have been deprived of their rights and have lost income, earnings, and other benefits.

101.     In addition to monetary damages, Plaintiff and the proposed class seek injunctive and declaratory relief to correct Uber's unlawful policies and practices as well as attorney's fees and costs.

**SECOND CLAIM FOR RELIEF**
**(Uber's Violations of the NYCHRL's Disparate Impact Provision)**
**(Brought by Plaintiff on Behalf of Himself and the Disparate Impact Class)**

102.     Plaintiff, on behalf of himself and the Class Members, incorporates by reference all preceding paragraphs.

103.     The NYCHRL provides that, "[a]n unlawful discriminatory practice based upon disparate impact is established when . . . a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter."  N.Y.C. Admin. Code § 8-107(17)(a)(1).

104.     Uber denied employment to Plaintiff and the Disparate Impact Class based in whole or in part on the criminal history information contained in their consumer reports without complying with any of the Fair Chance Act provisions of the NYCHRL.

105.     Uber's policy of barring current and potential drivers with criminal history in New York City from its platform without engaging in the Fair Chance Act process has a disparate impact on Black and Latinx individuals, who are more likely to have criminal histories, and who would benefit from Uber's legal obligation to engage in the required Fair Chance Act process and from the opportunity to explain their criminal history and respond to Uber's concerns.

106.     Uber's policy creates a significant barrier to Black and Latinx individuals in New York City who drive for Uber or wish to drive for Uber that is neither job-related nor consistent with business necessity.

107.     Uber's wholesale noncompliance with the Fair Chance Act provisions of the NYCHRL are not and cannot be job-related or consistent with business necessity.

108.     There are far less discriminatory alternatives available to Uber that would have better achieved any legitimate driver workforce interests Uber may have.  For example, Uber could have complied in the first instance with the Fair Chance Act provisions of the NYCHRL.

109.     Due to Uber's conduct, Plaintiff and the Disparate Impact Class have been deprived of their rights and have lost income-earning opportunities with Uber.

110.     Plaintiff and the Disparate Impact Class seek injunctive and declaratory relief to correct Uber's discriminatory policies and practices as well as monetary relief, including compensatory damages, and attorney's fees and costs.

## THIRD CLAIM FOR RELIEF
### (Uber's Violations of the FCRA)
### (Brought by Plaintiff on Behalf of Himself and the
### Criminal History Discrimination and Notice Class)

111.     Plaintiff, on behalf of himself and the Class Members, incorporates by reference all preceding paragraphs.

112.     Under the FCRA, Checkr is a "consumer reporting agency" (CRA), and the background checks it sells to Uber are "consumer reports."

113.     Under the FCRA, Uber is a "person" using "consumer reports" of Plaintiff and Class Members for "employment purposes" and has taken "adverse action" against Plaintiff and Class Members by refusing to permit them access to or deactivating them from its labor platform.

114.     The FCRA prohibits any company from using a consumer report in whole or in part to take adverse action against a consumer unless that company has provided the consumer

with a pre-adverse action notice that includes a copy of the consumer report and a written description of FCRA rights.  15 U.S.C. § 1681b(3)(A).  The purpose of this provision is to permit consumers an opportunity to: (a) learn that adverse action may be taken; (b) review the consumer report that forms the basis for the adverse action; (c) correct any inaccuracies before any adverse action is taken; and (d) be informed of their rights under the FCRA.

115.     The FCRA also requires any company actually taking adverse action against a consumer to provide that consumer with a written adverse action notice, which must inform the consumer that adverse action has been taken based on information found in a consumer report and must also include the following: (i) contact information for the CRA that provided the consumer report; (ii) a statement that the CRA is not the party taking the adverse action and cannot supply a reason for the adverse action; (iii) notice of the applicant's right to obtain a second report, free of charge, from that same CRA within a time period not to exceed 60 days; and (iv) a disclosure of the applicant's rights under the FCRA, including the right to dispute the information contained in the consumer report, relative to accuracy and completeness.  15 U.S.C. § 1681m(a).

116.     Uber willfully violated the FCRA by failing to provide Plaintiff and Class Members, before taking adverse action against them, with a pre-adverse action notice, including all required disclosures and a copy of their consumer reports, and then failing to provide Plaintiff and Class Members, after taking adverse action against them, with an adverse action notice, including all required disclosures.  Uber's conduct was knowing and reckless because it utterly failed to comply with the statute and provide any of the required documents or disclosures before taking adverse action against Plaintiff and Class Members.   At the bare minimum, Uber's

conduct was reckless because it failed to make an appropriate inquiry to ascertain its obligations under the FCRA.

117.    Uber's policy caused concrete injury (including the risk of harm) to Plaintiff and Class Members because it deprived them of the opportunity to:

(i)     Evaluate information contained in the consumer reports to ensure accuracy;
(ii)    Challenge and correct that information;
(iii)   Explain the circumstances surrounding that information (even if accurate);
(iv)    Explain why information reported should not preclude employment; and
(v)     Explain why information that was different on the consumer report than the application should not preclude employment.

118.    Checkr furnished and Uber obtained Plaintiff's consumer report for employment purposes in that Uber was determining Plaintiff's eligibility to remain part of its driver workforce and earn income through Uber.

119.    Because Uber's conduct in violating the FCRA was willful, Plaintiff and Class Members seek statutory damages, punitive damages, and attorney's fees and costs, in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

**FOURTH CLAIM FOR RELIEF**
**(Uber's Violations of the NY FCRA)**
**(Brought by Plaintiff on Behalf of Himself and the**
**Criminal History Discrimination and Notice Class)**

120.    Plaintiff, on behalf of himself and the Class Members, incorporates by reference all preceding paragraphs.

121.    Under the NY FCRA, Checkr is a "consumer reporting agency" (CRA), and the background checks it sells to Uber are "consumer reports."

122.    Under the NY FCRA, Uber is a "person" using "consumer reports" of Plaintiff and Class Members for "employment purposes" and has taken "adverse action" against Plaintiff

and Class Members by refusing to permit them access to or deactivating them from its labor platform.

123.     Uber procured consumer reports containing information regarding Plaintiff and Class Members from Checkr, a consumer reporting agency.

124.     Uber took adverse actions against Plaintiff and Class Members based in whole or in part on the information contained within those consumer reports.

125.     Before taking these adverse actions, Uber failed to provide Plaintiff and Class Members with a copy of Article 23-A of the Correction Law, in violation of N.Y. Gen. Bus. Law § 380-g(d).

126.     Due to Uber's actions, Plaintiff and Class Members have been deprived of their consumer rights and prevented from timely and effectively contesting the adverse action.

127.     Uber's willful conduct is reflected by, among other things, the fact that it violated a clear statutory mandate set forth in N.Y. Gen. Bus. Law § 380-g(d).

128.     Uber's willful conduct is further reflected by the fact that Uber has had years to become compliant with the NY FCRA and still fails to comply.

129.     Uber's willful negligent conduct makes it liable for actual damages, punitive damages, and attorney's fees and costs, in an amount to be determined by the Court pursuant to N.Y. Gen. Bus. Law § 380-1.

**FIFTH CLAIM FOR RELIEF**
**(Checkr's Violations of the FCRA)**
**(Brought by Plaintiff on Behalf of Himself and the**
**Criminal History Discrimination and Notice Class)**

130.　　Plaintiff, on behalf of himself and the Class Members, incorporates by reference all preceding paragraphs.

131.　　The FCRA requires CRAs to first obtain certification from the user of its consumer reports that the user has complied or will comply with the FCRA's disclosure requirements with respect to the subjects of those reports and that "information from the consumer report will not be used in violation of any applicable Federal or State equal employment opportunity law or regulation." 15 U.S.C. § 1681b(b)(1)(A)(i) and (ii).

132.　　Checkr did not obtain such certification from Uber with respect to Plaintiff's and Class Members' consumer reports because Uber failed to comply with every applicable provision of the FCRA before taking adverse action against Plaintiff and Class Members based in whole or in part on their consumer reports. Checkr also failed to obtain Uber's certification that the consumer reports would not be used in violation of applicable state equal employment opportunity law, specifically the NYCHRL, Article 23 of the New York State Corrections Law, and the NY FCRA.

133.　　The Court may easily draw the inference that Checkr failed to obtain the required certifications from Uber due to Uber's brazen noncompliance with the NYCHRL, FCRA, and NY FCRA.

134.　　The FCRA is a consumer protection statute in which Congress conferred upon all consumers, including Plaintiff, the right to protection of their private information unless certain conditions and procedures were followed. Because Plaintiff's consumer report was distributed by Checkr to Uber without any of the proper and required disclosures and without the required

certification, Plaintiff's privacy was invaded and he was deprived of his right to protection of his private information in violation of the FCRA.

135.     Checkr's violation of the certification provision of the FCRA was knowing and reckless because it did not take any steps to obtain Uber's proper certification and did not take any steps to remedy Uber's noncompliance with the applicable provisions of the FCRA.

136.     Because Checkr's conduct in violating the FCRA was willful, Plaintiff and Class Members seek statutory damages, punitive damages, and attorney's fees and costs, in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

## **PRAYER FOR RELIEF**

137.     WHEREFORE, Plaintiff and the Class Members pray for relief as follows:

    (i)    A declaratory judgment that the practices complained of herein are unlawful and violate the NYCHRL, FCRA, and NY FCRA;

    (ii)    A preliminary and permanent injunction against Uber and Checkr and all officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

    (iii)    Certification of the case as a class action under Fed. R. Civ. P. 23(b)(2), (b)(3), and/or (c)(4);

    (iv)    Designation of Plaintiff as the representative of the Criminal History Discrimination and Notice Class and as the representative of the Disparate Impact Class;

    (v)    Designation of Plaintiff's counsel of record as Class Counsel;

    (vi)    An order forbidding Defendants from engaging in further unlawful conduct in violation of the NYCHRL, FCRA, and NY FCRA;

    (vii)    An award of actual, real, and/or statutory damages for Defendants' willful conduct;

    (viii)    Punitive damages to deter future misconduct in an amount commensurate with Defendants' ability to pay;

(ix)   Costs incurred herein, including reasonable attorney's fees to the extent allowable by law;

(x)   Pre-judgment and post-judgment interest, as provided by law;

(xi)   Payment of a reasonable service award to Plaintiff, in recognition of the services he has rendered and will continue to render to Class Members, and the risks he has taken and will take; and

(xii)   Such other and further legal and equitable relief, including nominal damages, as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury in this action.

Dated: New York, New York
        April 8, 2021

Respectfully submitted,

**MOBILIZATION FOR JUSTICE, INC.**

By: */s/ Michael N. Litrownik*
        Michael N. Litrownik

Michael N. Litrownik
Carolyn Coffey
100 William Street, 6th Floor
New York, NY 10038
Tel: (212) 417-3858
Fax: (212) 417-3890
Email: mlitrownik@mfjlegal.org

**TOWARDS JUSTICE**

By: */s/ Juno Turner*
        Juno Turner

Juno Turner
David H. Seligman (to seek *pro hac vice* admission)
2840 Fairfax Street, Suite 200
Denver, CO 80207
Tel: (720) 295-8846
Fax: (303) 957-2289
Email: juno@towardsjustice.org

*Attorneys for Plaintiff and the Proposed Classes*