IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JOB GOLIGHTLY, on behalf of himself and all
others similarly situated,

                      Plaintiff,

     v.

UBER TECHNOLOGIES, INC., and
CHECKR, INC.,

                      Defendants.

No. 1:21-cv-03005 (LJL)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT UBER TECHNOLOGIES, INC.'S MOTION TO COMPEL
ARBITRATION AND DISMISS, OR ALTERNATIVELY, STRIKE PLAINTIFF'S
<u>CLASS ALLEGATIONS AND STAY PROCEEDINGS</u>**

# TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 1

II. PROCEDURAL AND FACTUAL BACKGROUND....................................................... 2

    A.  Procedural Background.............................................................................. 2

    B.  Factual Background ................................................................................... 3

III. LEGAL STANDARD........................................................................................... 7

IV. LEGAL ARGUMENT........................................................................................... 8

    A.  The Gig Economy Is the Frontier of Independent Contracting ............................. 8

    B.  Racial and Socioeconomic Disparities Plague the Gig Economy Workforce ........ 8

    C.  The FAA's Section 1 Exemption Should be Construed Expansively to Encompass Uber Rideshare Drivers ................................................................... 10

        i.   The Legislative History of the Section 1 Exemption Confirms the Drafters' Intent to Remove Labor Transportation Disputes from the FAA's Purview ..................................................................................... 10

        ii.  The Section 1 Exemption's Use of "Engaged in Interstate Commerce" Historically Included the Entire Stream of Commerce ............................. 11

        iii. Circuit City Unduly Narrowed the Section 1 Exemption to Transportation Workers ......................................................................... 13

            a.   Post-Circuit City Decisions Have Incorrectly Concluded that Intrastate Movement Does Not Qualify as Engaging in Commerce ................................................................................. 13

            b.   Interstate Travel Need Not Constitute a Central Feature of a Transportation Worker's Job to Fall Within Section 1 ................. 14

    D.  On This Record, Uber Drivers Are Exempt From the FAA ................................. 15

        i.   Uber Drivers Are Exempt from the FAA Under Section 1 ...................... 15

            a.   Uber's Agreements Are Contracts of Employment..................... 16

            b.   The Section 1 Exemption Encompasses Drivers Who Transport Passengers ................................................................. 16

c.    Uber Drivers Engage in Interstate Commerce Through Both Interstate Travel and Intrastate Travel Within the Flow of Interstate Commerce ..................................................... 17

d.    Uber's Contrary Authority is Distinguishable ............................. 21

E.    If New York Law Applies, Uber's Arbitration Clause is Void and Unenforceable ....................................................................................... 23

F.    Uber's Class Action Waiver is Unenforceable Under New York Law ................ 25

V.    CONCLUSION .......................................................................................... 26

# TABLE OF AUTHORITIES

CASES                                                                                                          PAGE(S)

*Aleksanian v. Uber Techs.*, Inc.,
   524 F. Supp. 3d 251 (S.D.N.Y., Mar. 8, 2021) .......................................................22

*Barefoot v. Mid-America Dairymen, Inc.*,
   826 F. Supp. 1046 (N.D. Tex., July 15, 1993)......................................................21

*Bensadoun v. Jobe-Riat*,
   316 F.3d 171 (2d Cir. 2003).............................................................................7

*Brennan v. Schwerman Trucking Co.*,
   540 F.2d 1200 (4th Cir. 1976) ..........................................................................21

*BS Sun Shipping Monrovia v. Citgo Petroleum Corp.*,
   No. 06 Civ. 839, 2006 U.S. Dist. LEXIS 54588 (S.D.N.Y., Aug. 8, 2006) ............................8

*Capriole v. Uber Techs., Inc.*,
   460 F. Supp. 3d 919 (N.D. Cal., May 13, 2020).....................................................14

*Capriole v. Uber Techs., Inc.*,
   7 F.4th 854 (9th Cir. 2021) .............................................................................22

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).....................................................................................7

*Circuit City Stores, Inc. v. Adams*,
   532 U.S. 105 (2001).................................................................................12, 13

*Cunningham v. Lyft, Inc.*,
   2021 U.S. App. LEXIS 33010_ F.4th_, *at 17 (1st Cir. 2021)...........................................22

*Davarci v. Uber Techs., Inc.*,
   2021 U.S. Dist. LEXIS 157948 (S.D.N.Y., Aug. 20, 2021) .................................16, 17, 22, 23

*Gonzalez v. Lyft, Inc.*,
   2021 U.S. Dist. LEXIS 17188 (D.N.J. Jan. 29, 2021) ...............................................17

*Haider v. Lyft, Inc.*,
   2021 U.S. Dist. LEXIS 62690 (S.D.N.Y., Mar. 31, 2021) ........................................ *passim*

*Harden v. Roadway Package Sys, Inc.*,
   249 F.3d 1137 (9th Cir. 2001) ..........................................................................16

*International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast*,
   *LLC,* 702 F.3d 954, 958 (7th Cir. 2012) ........................................................15, 19, 20

*Islam v. Lyft, Inc.*,
 524 F. Supp. 3d 338 (S.D.N.Y., Mar. 9, 2021) .......................................17, 18, 20

*Morris v. McComb*,
 332 U.S. 422 (1947) ...........................................................................................21

*New Prime v. Oliveira*
 139 S. Ct. 532, 539 (2019) ...........................................................................15, 16

*Nicosia v. Amazon.com, Inc.*,
 834 F.3d 220 (2d Cir. 2016) ................................................................................8

*O'Connor v. Uber Techs., Inc.*,
 82 F. Supp. 3d 1133 (N.D. Cal. Mar. 11, 2015) ................................................16

*Osvatics v. Lyft, Inc.*,
 2021 U.S. Dist. LEXIS 77559 (D.D.C., Apr. 22, 2021) ....................................22

*Pederson v. Del. Lackawanna, & W. R.R. Co.*,
 229 U.S. 146 (1913) ...........................................................................................12

*Rittman v. Amazon.com, Inc.*,
 971 F.3d 904 (9th Cir. 2020) .............................................................................20

*Rogers v. Lyft, Inc.*,
 452 F. Supp. 3d 904 (N.D. Cal., Apr. 7, 2020) ...........................................14, 22

*Singh v. Uber Techs., Inc.*,
 939 F.3d 210 (3d Cir. 2019) ...................................................................16, 17, 22

*Smith v. Allstate Power Vac, Inc.*,
 482 F. Supp. 3d 40 (E.D.N.Y., Aug. 26, 2020) .................................................21

*St. Louis, S.F. & Tex. Ry. Co. v. Seale*,
 229 U.S. 156 (1913) ...........................................................................................12

*Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am.*,
 207 F.2d 450 (3d Cir. 1953) ...............................................................................13

*U.S. v. Am. Bldg. Maint. Indus.*,
 422 U.S. 271 (1975) ...........................................................................................12

*United States v. Yellow Cab Co.*,
 332 U.S. 218 (1947) ...........................................................................................20

*Waithaka v. Amazon.com, Inc.*,
 966 F.3d 10 (1st Cir. 2020) ................................................................................21

*Wallace v. Grubhub Holdings, Inc.*,
970 F.3d 798 (7th Cir. 2020) ........................................................................13, 15

## STATUTES

Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* .................................................12

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ....................................................... *passim*

1914 Clayton Antitrust Act, 15 U.S.C. § 13 *et seq.*......................................................11

Federal Employers Liability Act of 1908, 45 U.S.C. § 51 *et seq.* ...........................12, 13

Federal Trade Commission Act, 15 U.S.C. §§ 41-58 ..................................................12

Motor Carrier Act, 49 U.S.C. § 301 *et seq.* .................................................................21

N.Y. Constitution, Art. I, § 17. ......................................................................................25

New York City Human Rights Law, N.Y.C. Admin Code § 8-102 *et seq.*.....................1, 2, 24, 25

New York Fair Credit Reporting Act, N.Y. Gen. Bus. Law § 380 *et seq.*.......................2

New York Civil Practice Law § 7515.............................................................................24

State Labor Relations Act, N.Y. Labor Law § 700........................................................26

## OTHER AUTHORITIES

Conor Bradley, *Seamen, Railroad Employees, and Uber Drivers: Applying the Section 1 Exemption in the Federal Arbitration Act to Rideshare Drivers*, 54 U. Mich. J.L. Reform. 525, 530 (2021) ...........................................................10

Current Population Survey staff, *Electronically mediated work: new questions in the Contingent Worker Supplement*, Monthly Lab. Rev., U.S. Bureau of Labor Statistics, September 2018, *available at*:.https://www.bls.gov/opub/mlr/2018/article/electronically-mediated-work-new-questions-in-the-contingent-worker-supplement.htm (last visited Dec. 21, 2021). ........................................................................................................................8

Marketplace-Edison Research Poll: The Gig Economy (December 2018), *available at*: http://www.edisonresearch.com/wp-content/uploads/2019/01/Gig-Economy-2018-Marketplace-Edison-Research-Poll-FINAL.pdf (last visited Dec. 21, 2021) ...................................................................9

Monica Anderson, Colleen McClain, Michelle Faverio, and Risa Gelles-Watnick, *The State of Gig Work in 2021*, Pew Research Center, December 8, 2021, *available at*: https://www.pewresearch.org/internet/2021/12/08/the-state-of-gig-work-in-2021/ (last visited Dec. 21, 2021)........................................................................8

New York City Affairs, *The Magnitude of Low-Paid Gig and Independent Contract Work in New York State* (February 2020), *available at*: https://static1.squarespace.com/static/53ee4f0be4b015b9c3690d84/t/5e424aff d767af4f34c0d9a9/1581402883035/Feb112020_GigReport.pdf (last visited Dec. 21, 2021)..............................................................................................9

Pew Research Center, *The State of Gig Work in 2021*, December 8, 2021, *available at*: https://www.pewresearch.org/internet/2021/12/08/the-state-of-gig-work-in-2021/#fn-27788-2 (last visited Dec. 21, 2021)...................................8, 9

*Sales and Contracts to Sell in Interstate and Foreign Commerce, and Federal Commercial Arbitration: Hearing Before the Subcomm. of the S. Comm. on the Judiciary*, 67th Cong. 79 (1923). ...................................................................11

Uber, *Schedule a Ride*, *available at*: https://www.uber.com/us/en/ride/how-it-works/scheduled-rides/ (last visited Dec. 21, 2021). ...............................................7

*Seamen Condemn Arbitration Bill*, N.Y. Times, Jan. 14, 1923, *available at*: https://www.nytimes.com/1923/01/14/archives/seamen-condemn-arbitration-bill-delegates-to-unions-annual-meeting.html (last visited Dec. 21, 2021)...........................10

Uber, 2021 Annual Report, *available at*: https://s23.q4cdn.com/407969754/files/doc_financials/2021/ar/FINAL-Typeset-Annual-Report.pdf (last visited Dec. 21, 2021).......................................3, 4

Uber Form S-1, April 11, 2019, *available at*: https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d64 7752ds1.htm (last visited Dec. 21, 2021) .................................................6

Uber Form S-1, February 26, 2021, *available at*: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001543151/65457024-f641-4ce3-a796-ff1f69f435b5.pdf ............................................................6, 20

Uber Form S-1, March 2, 2020, at 20, *available at*: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001543151/f272e038-1c89-456c-acf8-cea0cffe544d.pdf (last visited Dec. 21, 2021).......................................6

U.S. Bureau of Labor Statistics, September 2018, *available at*: https://www.bls.gov/opub/mlr/2018/article/electronically-mediated-work-new-questions-in-the-contingent-worker-supplement.htm (last visited Dec. 21, 2021) ......................................................................................8

Wesley A. Sturges, *Commercial Arbitration and Awards* § 15 (1930)..........................................10

# I.  INTRODUCTION

Plaintiff Job Golightly brought this proposed class action lawsuit to correct Uber's failure to comply with the New York City Human Rights Law (NYCHRL) and federal and state fair credit reporting laws.  Specifically, Mr. Golightly challenges Uber's use of drivers' background checks as grounds to summarily deactivate them from its labor platform.  Mr. Golightly also alleges that Uber's failure to comply with these civil rights laws has a disparate impact based on race given the demographics of gig economy drivers and statistical disparities by race in rates of criminal justice system involvement.

Instead of engaging with the merits of these claims and coming into compliance with important civil rights laws, Uber has moved to compel individual arbitration to avoid classwide accountability in a court of law.  Uber's motion should be denied.  First, the text, legislative history, purpose, and the original understanding of the phrase "engaged in commerce" strongly suggest the Court should construe the Federal Arbitration Act's Section 1 exemption expansively.  Second, the limited discovery record in this matter confirms that Uber drivers fit particularly well within the exemption, as properly construed, given their substantial role in both directly and indirectly facilitating the flow of interstate travel and commerce.  Finally, it is critical for the Section 1 exemption to be broadly construed given rideshare companies' unfettered dominance in the interstate and intrastate transportation markets.  Without recourse to the exemption, rideshare drivers, who are primarily low-income people of color, have no ability to vindicate important civil rights claims in court or as class actions.

For these reasons, Uber's request to compel arbitration and dismiss, or, alternatively to strike Plaintiff's class allegations and stay the action should be denied.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

### A.   <u>Procedural Background</u>

On April 8, 2021, Plaintiff Job Golightly filed a class action complaint against Uber and Checkr, a company Uber retained to conduct criminal background checks on its current and prospective drivers.  ECF No. 1.  Mr. Golightly, a Black man who lives in the Bronx, had supported himself by driving for Uber for many years until Uber unlawfully deactivated him from the platform in August 2020 due to a 2013 out-of-state speeding ticket misdemeanor that appeared on his background check.  *Id.*  Before and after Uber deactivated Mr. Golightly, he did not receive any disclosures or communications required by city, state, or federal law, and Uber did not provide him the opportunity to rehabilitate or explain his 2013 misdemeanor.  *Id.*

Mr. Golightly brought claims under the Fair Chance Act provisions of the NYCHRL, the federal Fair Credit Reporting Act (FCRA) , and the New York Fair Credit Reporting Act (NY FCRA), challenging Uber and Checkr's unlawful policies and practices of summarily deactivating him and other current drivers from Uber's labor platform based on criminal history contained in background checks conducted by Checkr without any of the required process, disclosures, communications, or opportunity to explain his misdemeanor.  *Id.*

Mr. Golightly also brought class action claims on behalf of two classes: (a) an NYCHRL and FCRA discrimination and notice class, consisting of all current and prospective drivers for Uber who were background checked by Checkr and then either deactivated or not hired due to the background check and who did not receive required notices and disclosures; and (b) an NYCHRL disparate race impact class consisting of Black and Latino drivers and prospective drivers who were background checked by Checkr and then either deactivated or not hired due to the background check and who did not receive required notices and disclosures.  *Id.*

Both Uber and Checkr advised that they intended to move to compel arbitration. ECF Nos. 13, 15.[1] At the initial pretrial conference, Plaintiff sought to take limited discovery regarding whether Uber drivers fell within the FAA's Section 1 exemption, 9 U.S.C. § 1. ECF No. 30. The Court permitted Plaintiff to serve discovery requests but permitted Uber to move for a protective order staying the discovery in anticipation of a ruling on its motion to compel, and also stayed Plaintiff's time to respond to the motion to compel arbitration pending a ruling on the motion to stay discovery. *Id.*

On August 11, 2021, the Court denied Uber's motion for a protective order to stay discovery, holding that it failed to demonstrate good cause for a protective order because the applicability of the Section 1 exemption to Uber drivers "cannot be determined based on the allegations of the complaint and the documents incorporated therein." ECF No. 30 at 7-8.[2] The parties spent the next several months meeting and conferring on Plaintiff's limited discovery requests and resolving disputes, with Uber eventually producing relevant documents and data on Uber drivers at the nationwide, local New York metro area, and individual (Plaintiff) level.

### B. Factual Background

Uber is a transportation company based in California that "powers movement from Point A to Point B."[3] Uber's ridesharing platform and services are part of its "Mobility" business.[4]

---

[1] On July 26, 2021, the parties stipulated to voluntarily dismiss Defendant Checkr, Inc. ECF No. 28.

[2] The Court also permitted Uber to file a supplemental brief addressing the limited discovery record before Plaintiff responded to the motion to compel arbitration. ECF No. 30 at 12 n.6.

[3] Uber, 2021 Annual Report at 4, *available at*: https://s23.q4cdn.com/407969754/files/doc_financials/2021/ar/FINAL-Typeset-Annual-Report.pdf (last visited Dec. 21, 2021).

[4] *Id.*

Its transportation platform is available in approximately 71 countries around the world, with the U.S. market constituting 21% of all trips.[5]

As the Court's August 11, 2021 Opinion and Order makes clear, the parties do not dispute several key facts relating to this dispute. The parties agree that in order to receive the Uber driver application and to be able to accept rides through Uber's service, Plaintiff had to click the "I agree" box twice on a webpage that contained a link to Uber's Platform Access Agreement (the "January 2020 PAA"). ECF No. 30 at 1-2. The parties further agree that the January 2020 PAA contained an arbitration provision that purports to cover this dispute as well as a class waiver that purports to bar class actions and that Plaintiff did not opt out of the arbitration provision. *Id.* at 2. The parties also agree that the FAA governs the arbitration provision unless Plaintiff demonstrates that he is exempt from the FAA. *Id*. at 3.

The parties do dispute, however, what the limited discovery record reveals. Contrary to Uber's claims, *see* ECF No. 43 at 6-9, the record confirms that Plaintiff, Uber drivers in the New York Metro Area,[6] and Uber drivers nationwide are engaged in interstate commerce for purposes of the Section 1 exemption through both directly transporting passengers interstate, as well as transporting passengers within the flow and channels of interstate commerce. This conclusion is supported both by trip data as well as the data on the gross fares drivers earn from performing such trips. Taken together, along with additional public data and documents produced in discovery, the record confirms that (a) Uber drivers not only engage in interstate commerce through such work but earn a substantial percentage of their income from it; (b) Uber seeks individuals with commercial trucking and other interstate commerce experience for its driver

---

[5] *Id.* at 21.
[6] The parties agreed to define "New York Metro Area" for purposes of the limited discovery and this case to include New York City, New York City suburbs (e.g., Long Island, Westchester, and surrounding counties), New Jersey, and Connecticut.

role; and (c) Uber partners with cities and airports to facilitate travel within the flow of interstate commerce. Uber has produced the following data for a nationwide and a New York Metro Area class of drivers, as well as for Plaintiff:

| **Nationwide Uber Driver Data** | **2018** | **2019** | **2020** | **2021**[7] |
|---|---|---|---|---|
| Percentages of interstate trips out of total Uber trips nationwide (*see* Ex. A at 24-25) | 2.5% | 2.3% | 2.1% | 2.2% |
| Percentages of Uber driver gross fares out of total driver gross fares derived from nationwide interstate trips (*see id.* at 30-31)[8] | 5.8% | 5.5% | 4.6% | 4.7% |
| Percentages of airport trips out of the total nationwide number of trips (*see id.* at 34) | 9.4% | 10.1% | 7.3% | 8.7% |
| Percentages of Uber driver gross fares out of total driver gross fares derived from nationwide airport trips (*see id.* at 37-38) | 19.9% | 20.4% | 14.2% | 16.6% |

| **NY Metro Area Uber Driver Data** | **2018** | **2019** | **2020** | **2021** |
|---|---|---|---|---|
| Percentages of NY Metro Area interstate trips out of total Uber NY Metro Area trips (*see* Ex. A at 24-25) | 3.0% | 2.9% | 2.3 | 2.7% |
| Percentages of Uber driver gross fares out of driver gross fares derived from interstate trips in NY Metro Area (*see id.* at 30-31) | 11.2% | 10.1% | 7.7% | 8.1% |
| Percentages of airport trips out of the total number of NY Metro Area trips (*see id.* at 34-35) | 6.6% | 7.2% | 3.9% | 4.6% |
| Percentages of Uber driver gross fares out of gross fares derived from airport trips in NY Metro Area (*see id.* at 37-38) | 16.9% | 17.7% | 9.0% | 10.3% |

---

[7] All 2021 data to date, according to Uber, is based on a random sample that, to the best of Uber's knowledge based on the size of the sample and sampling methodology used, is representative. *See* Ex. A to Litrownik Decl. (Uber's Fourth Supplemental and Amended Responses and Objections to Plaintiff's Interrogatories) at 25 n.1.

[8] All gross fare data is based on a random sample that, to the best of Uber's knowledge based on the size of the sample and sampling methodology used, is representative. *Id.* at 37-38.

| | | | | |
|---|---|---|---|---|
| Percentages of trips terminating at transit hub locations[9] out of all trips terminating in New York City (*see id.* at 42) | 0.94% | 0.85% | 0.64% | 0.70% |
| Percentages of driver gross fares for trips terminating at transit hub locations in New York City out of driver gross fares for all trips terminating in New York City (*see id.* at 46-47) | 0.90% | 0.93% | 0.64% | 0.67% |

| **Plaintiff Driver Data** | **2018** | **2019** | **2020** | **2021** |
|---|---|---|---|---|
| Plaintiff's interstate trips as a percentage of total trips (*see* Ex. A at 47-48) | 3.3% | 3.1% | 3.2% | N/A |
| Gross fares from Plaintiff's interstate trips as a percentage of gross fares from total trips (*see id.*) | 10.5% | 9.1% | 10.1% | N/A |
| Percentage of airport trips out of the total number of nationwide airport trips (*see id.*) | 18.0% | 17.6% | 6.7% | N/A |
| Gross fares from Plaintiff's airport trips as a percentage of gross fares from total trips. (*see id.*) | 36.5% | 37.6% | 16.9% | N/A |

Publicly available information and data bolsters the discovery record. In 2018, Uber generated "15% of [] Ridesharing Gross Bookings from trips that either started or were completed at an airport" and "expect[s] this percentage to increase in the future."[10] Uber also

---

[9] These transit hub locations in New York City include Penn Station, Moynihan Train Hall, Grand Central, Port Authority Bus Station, GWB Bus Station, Pier 11, Pier 79, Manhattan Cruise Terminal, and Red Hook Cruise Terminal.

[10] *See Uber Technologies, Inc.* Form S-1, April 11, 2019, at 38, *available at*: https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm (last visited Dec. 21, 2021). In 2019, the 15% figure remained the same. *Uber Technologies, Inc.* Form S-1, March 2, 2020, at 20, *available at*: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001543151/f272e038-1c89-456c-acf8-cea0cffe544d.pdf (last visited Dec. 21, 2021). In 2020, the percentage went down to 9% due to the Covid-19 pandemic. *Uber Technologies, Inc.* Form S-1, February 26, 2021, at 24, *available at*: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001543151/65457024-f641-4ce3-a796-ff1f69f435b5.pdf ("[A]s a result of the COVID-19 pandemic, travel behavior has changed and airline travel has slowed, reducing the demand for Mobility to and from airports.") (last visited Dec. 21, 2021).

partners with airlines and airports to facilitate airport pickups,[11] and passengers can preschedule airport trips.[12]  Moreover, the Uber "job description" for the driver role confirms that experience in interstate transport is a key qualification for the position.[13]

It is also clear from the data that Mr. Golightly engaged in substantial interstate and airport trips and earned an even more substantial percentage of his income from such trips.  *See supra* Section II.B., <u>Plaintiff Driver Data</u>.  Most strikingly, before the Covid-19 pandemic in March 2020 sharply reduced air travel, over 35% of Mr. Golightly's fares were earned from airports trips.  *Id.*

## III.  LEGAL STANDARD

In deciding a motion to compel arbitration, a district court applies a "standard similar to that applicable for a motion for summary judgment."  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).  Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Under this standard, "a court [must] consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions

---

[11] *Uber Technologies, Inc.* Form S-1, February 26, 2021, at 24 ("[W]e have entered into agreements with most major U.S. airports … to allow the use of our platform within airport boundaries ….").

[12] *Schedule a Ride*, Uber.com, *available at*: https://www.uber.com/us/en/ride/how-it-works/scheduled-rides/ ("Get a ride to the airport. Finally, there's no need to wake a loved one for that middle-of-the-night flight.") (last visited Dec. 21, 2021).

[13] *See* Ex. B (Uber U.S. Driver Evergreen Description) ("If you have previous employment experience in transportation (such as a delivery driver, driver, professional driver, driving job, truck driver, heavy and tractor-trailer driver, cdl truck driver, class a or class b driver, local truck driver, company truck driver, taxi driver, taxi chauffeur, cab driver, cab chauffeur, taxi cab driver, transit bus driver, bus driver, coach bus driver, bus operator, shuttle driver, bus chauffeur) you might also consider driving with Uber and earn extra money.").

on file, together with . . . affidavits," and the Court must draw "all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). It is often "proper (and in fact necessary) to consider . . . extrinsic evidence when faced with a motion to compel arbitration." *BS Sun Shipping Monrovia v. Citgo Petroleum Corp.*, No. 06 Civ. 839, 2006 U.S. Dist. LEXIS 54588, at *10 n.6 (S.D.N.Y., Aug. 8, 2006).

## IV. LEGAL ARGUMENT

### A. The Gig Economy Is the Frontier of Independent Contracting.

Online platforms are revolutionizing how workers contract with consumers, contributing to a robust gig economy that is increasingly replacing traditional forms of independent contracting. The gig economy is an economic system in which online labor platforms, often smartphone applications, connect independent contractors with potential consumers for the completion of short jobs or tasks, and facilitate payment for that work.[14] Gig work now comprises a significant portion of the U.S. labor market. Sixteen percent of Americans have performed work through an online gig platform.[15]

### B. Racial and Socioeconomic Disparities Plague the Gig Economy Workforce.

People of color disproportionately comprise the gig economy's workforce and rely on the income generated by such labor more than their white counterparts. As of 2017, roughly 17% of Black adults performed electronically mediated work, despite constituting only 12% of the total

---

[14] Current Population Survey staff, *Electronically mediated work: new questions in the Contingent Worker Supplement*, Monthly Lab. Rev., U.S. Bureau of Labor Statistics, September 2018, *available at*: https://www.bls.gov/opub/mlr/2018/article/electronically-mediated-work-new-questions-in-the-contingent-worker-supplement.htm (last visited Dec. 21, 2021).
[15] Monica Anderson, Colleen McClain, Michelle Faverio, and Risa Gelles-Watnick, *The State of Gig Work in 2021*, Pew Research Center, December 8, 2021, *available at* https://www.pewresearch.org/internet/2021/12/08/the-state-of-gig-work-in-2021/ (last visited Dec. 21, 2021).

workforce.[16]  Thirty percent of Latinx adults have performed gig labor for financial gain, in stark

contrast to only 12% of white adults who have reported doing so.[17]  Financial anxiety may also

be more severe for gig workers of color, who report a greater reliance on gig-based income than

white laborers.  In 2018, approximately 47% and 55%, respectively, of Latinx and Black adults

who performed gig labor did so as their primary source of income, compared to just 41% of

white gig workers.[18]

New York City's workforce of app-based rideshare drivers is particularly plagued by

racial and socioeconomic inequity.  Eighty-seven percent of individuals working as independent

contractors in the City's transportation sector (primarily for Uber and Lyft) are persons of

color.[19]  Eighty-one percent do not have a college degree and 90% are foreign-born.[20]  The

starkly racialized nature of this work makes it even more important that gig economy workers be

---

[16] US. Bureau of Labor Statistics, *supra* note 14.

[17] Pew Research Center, *The State of Gig Work in 2021*, December 8, 2021, *available at*:
https://www.pewresearch.org/internet/2021/12/08/the-state-of-gig-work-in-2021/#fn-27788-2
(key findings from a survey conducted by Pew Research Center from August 23-29, 2021, which
consisted of 10,348 U.S. adults on the Center's nationally representative "American Trends
Panel") (last visited Dec. 21, 2021).

[18] Marketplace-Edison Research Poll: The Gig Economy (December 2018), at 5, *available at*:
http://www.edisonresearch.com/wp-content/uploads/2019/01/Gig-Economy-2018-Marketplace-Edison-Research-Poll-FINAL.pdf (last visited Dec. 21, 2021) (survey conducted via 1,044
virtual interviews in February 2018, using a national sample of the United States population age
18 and older).

[19] The New School Center for New York City Affairs, *The Magnitude of Low-Paid Gig and
Independent Contract Work in New York State* (February 2020), at 20, *available at*:
https://static1.squarespace.com/static/53ee4f0be4b015b9c3690d84/t/5e424affd767af4f34c0d9a9/
1581402883035/Feb112020_GigReport.pdf (last visited Dec. 21, 2021).

[20] *Id.*

able to vindicate their rights in court, including through class actions, to redress gig economy policies practices that have a disparate impact based on race.

### C. The FAA's Section 1 Exemption Should be Construed Expansively to Encompass Uber Rideshare Drivers.

The Section 1 exemption to the FAA covers Uber rideshare drivers like Plaintiff as well as rideshare drivers generally. The legislative history and caselaw establish that Congress intended the exemption to exempt transportation labor disputes. It is critical that rideshare drivers be able to vindicate important civil rights in court given the size of the gig economy rideshare market and its significant participation in interstate commerce.

### i. The Legislative History of the Section 1 Exemption Confirms the Drafters' Intent to Remove Labor Transportation Disputes from the FAA's Purview.

The FAA[21] was conceived by reform-minded advocates[22] as a statutory remedy to address the frequency with which courts historically construed agreements to arbitrate prospective disputes as freely revocable.[23] In 1922, Congress took up a draft federal arbitration statute assembled by the American Bar Association ("ABA"). The proposed legislation quickly faced criticism from pro-labor interests.[24]

---

[21] 9 U.S.C. § 1.

[22] Conor Bradley, *Seamen, Railroad Employees, and Uber Drivers: Applying the Section 1 Exemption in the Federal Arbitration Act to Rideshare Drivers*, 54 U. Mich. J.L. Reform. 525, 530 (2021) (citing Ian R. MacNeil, *American Arbitration Law: Reformation – Nationalization – Internationalization* 34-47 (1992).

[23] *See* Wesley A. Sturges, *Commercial Arbitration and Awards* § 15, at 45 (1930) ("It is an elementary proposition of the common law cases, and is almost universally accepted by the American courts, that future disputes clauses and provisions for arbitration are revocable.").

[24] Both the International Seamen's Union and a Senator voiced disapproval of the bill because it did not clarify whether or not it included labor disputes within its scope. The Union's president viewed the bill as depriving all citizens, "except those who have the knowledge and the money to hire the best of lawyers and who can afford to wait," the ability to advocate for their rights in court. *Seamen Condemn Arbitration Bill*, N.Y. Times, Jan. 14, 1923, at 21, *available at*:

In response to this criticism, the bills' drafters indicated, on the record, their intent to exclude employment disputes from their federal arbitration bill's proposed scope. During a hearing before the Senate Judiciary Committee in 1923, the chairman of the ABA committee that drafted the bill testified that the bill was not intended to "be an act referring to labor disputes at all."[25] The final bill contained the following carveout: "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in interstate or foreign commerce."[26] The Section 1 exemption was thus conceived and intended to exclude all employment disputes from the enforcement regime of the FAA.

### ii. The Section 1 Exemption's Use of "Engaged in Interstate Commerce" Historically Included the Entire Stream of Commerce.

Courts have long interpreted federal statutory schemes contemporaneous with the FAA (and earlier) with comparable "engaged in commerce" language to "embrace a stream-of-commerce conception of interstate commerce."[27] As early as 1870, the U.S. Supreme Court "held that purely intrastate state trips are in the flow of commerce as long as they are a component part of an interstate movement.[28] In 1975, the Supreme Court ruled that the 1914 Clayton Antitrust Act[29] applies to "the flow of interstate commerce—the practical, economic

---

https://www.nytimes.com/1923/01/14/archives/seamen-condemn-arbitration-bill-delegates-to-unions-annual-meeting.html (last visited Dec. 21, 2021).

[25] *Sales and Contracts to Sell in Interstate and Foreign Commerce, and Federal Commercial Arbitration: Hearing Before the Subcomm. of the S. Comm. on the Judiciary*, 67th Cong. 79 (1923) (statement of W.H.H. Piatt, Chairman, A.B.A. Comm'n).

[26] *Id.*

[27] Bradley, *supra* note 22, at 554.

[28] Bradley, *supra* note 22, at 554-55 (citing *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 565 (1870)).

[29] 15 U.S.C. § 13 ("It shall be unlawful for any person engaged in commerce…"), § 18 ("No person engaged in commerce…").

continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." *U.S. v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 276 (1975).

The Supreme Court also similarly construed the 1914 Federal Trade Commission Act.[30] Even the *Circuit City* decision,[31] which effectively narrowed the parameters of exempted workers to those engaged in transportation, "cited a definition of 'engaged in commerce' that explicitly uses a flow of commerce understanding of the phrase."[32]

A particularly instructive example is found in the Federal Employers Liability Act of 1908 (FELA), which rendered "every common carrier by railroad while engaging in commerce between any of the several States or Territories…liable in damages to any person suffering injury while he is employed by such carrier in such commerce."[33] The FELA specified that "any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce…shall be considered as entitled to the benefits of this chapter."[34] A pair of 1913 Supreme Court decisions expansively interpreted what constitutes being engaged in interstate commerce, holding that FELA entitled employees a right to sue, even if they did not literally cross state lines in the course of their work. *See Pederson v. Del. Lackawanna, & W. R.R. Co.*, 229 U.S. 146 (1913) (repairman injured while transporting, intrastate, materials to repair the defendant railroad's bridge was engaged in interstate commerce); *St. Louis, S.F. &*

---

[30] *See* Brief of the Ass'n of Trial Lawyers of America as Amici Curiae in Support of the Respondent at 6-8, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) (No. 99-1379) (noting that "several dozen" federal laws that contain the term "engaged in commerce," and others using the term "in commerce," "have been construed to apply to the entire stream of commerce, from the production of goods or services which pass through interstate channels until their distribution").

[31] *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) ("Section 1 exempts from the FAA only contracts of employment of transportation workers.").

[32] Bradley, *supra* note 22, at 554.

[33] 45 U.S.C. § 51.

[34] *Id.*

*Tex. Ry. Co. v. Seale*, 229 U.S. 156 (1913) (employee killed while traversing a Texan train yard to inspect an interstate freight train was engaged in interstate commerce). Because the FAA was enacted roughly 17 years after FELA, and 12 years after the *Pederson* and *St. Louis* decisions, the fact that the FAA's wording relies on the same "engage in commerce" construction confirms that the drafters intended an expansive scope.[35]

### iii. *Circuit City* Unduly Narrowed the Section 1 Exemption to Transportation Workers.

In *Circuit City*, the Supreme Court excluded non-transportation workers from the scope of the Section 1 exemption, undermining the FAA drafters' inclusive intent by improperly vesting the terms, "seamen" and "railroad employees," with restrictive power.[36] The *Circuit City* majority sought to remedy what it perceived to be excessive verbiage in the absence of any recognizably explanatory purpose by applying the cannons of *ejusdem generis* and surplusage to hold that "the application of the residual clause in section 1 should be limited to workers who are similar to railroad employees and seamen."[37]

### a. Post-*Circuit City* Decisions Have Incorrectly Concluded that Intrastate Movement Does Not Qualify as Engaging in Commerce.

Some lower courts, in an effort to define "transportation workers," have incorrectly construed *Circuit City* and the FAA to hold that a worker must physically cross state lines in order to fall within the Section 1 exemption.[38] Although Uber relies heavily on these cases, ECF

---

[35] Bradley, *supra* note 22, at 555 n.198. *See also Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am.*, 207 F.2d 450, 453 (3d Cir. 1953) ("In incorporating almost exactly the same phraseology into the Arbitration Act of 1925, its draftsmen and the Congress which enacted it must have had in mind this current construction of the language which they used.").
[36] Bradley, *supra* note 22, at 539.
[37] *Id*. at 539.
[38] *See, e.*g., *Wallace v. Grubhub Holdings, Inc*., 970 F.3d 798, 800 (7th Cir. 2020) ("[S]omeone whose occupation is not defined by its engagement in interstate commerce does not qualify for the exemption just because she occasionally performs that kind of work.").

No. 22-1 at 8-16 and ECF No. 43 at 1-5, such readings are "inconsistent with the historical interpretation of the phrase 'engaged in…commerce,' which does not impose this requirement."[39]  Some lower courts have held, confoundingly, that even when such intrastate movement involves the ferrying of passengers between airports and additional hubs of interstate travel, this activity does not occur within the flow of commerce.[40]  But this weak reasoning negates the applicability of the stream of commerce connotation of "engaged in commerce" to purely intrastate activity that, despite its localized nature, is nevertheless an essential "component" of interstate commerce.[41]

### b. Interstate Travel Need Not Constitute a Central Feature of a Transportation Worker's Job to Fall Within Section 1.

The cases on which Uber relies, ECF No. 22-1 at 8-16 and ECF No. 43 at 1-5, also unfairly devalue rideshare drivers' interstate movement when it does not comprise the bulk of their work.  Some courts have held that drivers must demonstrate not only that they traverse more than one state as part of their job duties but that this interstate movement represents a central feature of their employment, improperly limiting the scope of the exemption.

The FAA contains no such purity test for evaluating engagement in interstate commerce. The emphasis on the centrality of interstate travel in a rideshare driver's duties stems not from the FAA itself, but from the Seventh Circuit's decision in *Wallace v. GrubHub Holdings, Inc.*, a

---

[39] Bradley, *supra* note 22, at 554.

[40] Bradley, *supra* note 22, at 556 ("Recently, some lower courts have reasoned that intrastate trips using ridesharing platforms to and from airports and other points of interstate travel were not in the flow of commerce by pointing to the Supreme Court's *Yellow Cab* decision.  *See Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 917 (N.D. Cal., Apr. 7, 2020); *Capriole v. Uber Techs., Inc.*, 460 F. Supp. 3d 919, 931–32 (N.D. Cal., May 13, 2020), *aff'd*, 7 F.4th 854 (9th Cir. 2020).

[41] *See* Bradley, *supra* note 22, at 554-5, n.197 (citing *The Daniel Ball*, 77 U.S. (10 Wall.) at 557 ("The steamer in this case, being employed in transporting goods on Grand River *within the State of Michigan* destined for other states and goods brought from without the limits of Michigan and destined to places within that state, was engaged in commerce between the states.")) (emphasis added).

gig economy case concerning the vehicular transportation of goods, which held that, to "determine whether a class of workers meets that definition, we consider whether the interstate movement of goods is a *central part* of the class members' job description." 970 F.3d 798, 801 (7th Cir. 2020) (emphasis added).

This emphasis on centrality contravenes other precedent, even in the same circuit. For example, the Seventh Circuit, in *International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast*, *LLC*, appropriately refused to delineate engagement in interstate commerce based on the infrequency with which workers physically cross state lines. 702 F.3d 954, 958 (7th Cir. 2012) ("there is no basis in the text of §1 for drawing a line between workers who do a lot of interstate transportation work and those who cross state lines only rarely; both sorts of worker are 'engaged in foreign or interstate commerce.'"). Other lower courts have adopted *Kienstra's* position. *See infra* <u>Section D.i.C</u>. Notably, the *Wallace* court failed to grapple with the key principles from *Kienstra*.

As discussed further below, there is also mixed authority in this District on the issue. Several recent decisions appropriately conclude that there is no purity test for the exemption and find rideshare drivers to be exempt on records less developed than here, while several other recent decisions arrive at the opposite conclusion.

### D. <u>On This Record, Uber Drivers Are Exempt From the FAA.</u>

#### i. <u>Uber Drivers Are Exempt from the FAA Under Section 1.</u>

In *New Prime v. Oliveira*, the Supreme Court held that a court must be satisfied that the "transportation worker exemption" of Section 1 of the FAA does not apply before compelling arbitration. 139 S. Ct. 532, 539 (2019). To qualify for the exemption, a worker (1) must work pursuant to a "contract of employment"; (2) be "engaged in interstate commerce"; and (3) be a

transportation worker." *Harden v. Roadway Package Sys, Inc.*, 249 F.3d 1137, 1140 (9th Cir. 2001) (citation omitted). Uber drivers meet all three requirements.

### a. Uber's Agreements Are Contracts of Employment.

Uber drivers' contracts with Uber are "contracts of employment" despite Uber classifying the drivers as independent contractors. *See New Prime*, 139 S. Ct. at 541, 543-44 (holding that independent contractor agreements are "contracts of employment" because the term is used "in a broad sense to capture any contract for the performance of *work* by *workers*). Here, the contract between Uber drivers and driver is plainly a "contract for the performance of work by workers" because it controls the terms of an individual's use of Uber's platform to find passengers and transport them – i.e., the "work" drivers perform through Uber.

No court has accepted Uber's claim that the 2020 PAA is not a contract of employment. *See Davarci v. Uber Techs., Inc.*, 2021 U.S. Dist. LEXIS 157948, at *16 n.17 (S.D.N.Y., Aug. 20, 2021) (noting that "Uber has failed to identify any court that has bought its argument that the January 2020 PAA is nothing more than a 'license agreement' and is not a contract of employment").[42]

### b. The Section 1 Exemption Encompasses Drivers Who Transport Passengers.

Uber incorrectly contends, contrary to the weight of authority, that the Section 1 exemption applies only to workers who transport goods, not those who transport passengers, and therefore Uber drivers are ineligible for the exemption. But "nothing in the residual clause of § 1 suggests that it is limited to those who transport goods, to the exclusion of those who transport

---

[42] *See also, e.g.*, *Singh v. Uber Techs., Inc.*, 939 F.3d 210, 217 (3d Cir. 2019) (holding that "*New Prime* eliminated Uber's contract of employment argument because Congress used the phrase in a broad sense to capture any contract for the performance of work by workers") (citations and quotation marks omitted); *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1142 (N.D. Cal. Mar. 11, 2015) ("[I]t is obvious drivers perform a service for Uber …").

passengers." *Singh*, 939 F.3d at 221.  Numerous district courts across the country have followed

this precedent.  *See Davarci*, 2021 U.S. Dist. LEXIS 157948, at *13-15 (rejecting "Uber's

threshold argument that Uber drivers are not included within the Section 1 exemption because

they are engaged in the transport of passengers rather than physical goods"); *Haider v. Lyft, Inc.*,

2021 U.S. Dist. LEXIS 62690, at *7 (S.D.N.Y., Mar. 31, 2021) (holding that "an overwhelming

consensus rejects th[e] view" that "only those who transport goods are engaged in interstate

commerce"); *Gonzalez v. Lyft, Inc.,* 2021 U.S. Dist. LEXIS 17188, at *8 (D.N.J. Jan. 29, 2021)

(relying on *Singh*'s holding that Section 1 "may extend to a class of transportation workers who

transport passengers, so long as they are engaged in interstate commerce or in work so closely

related thereto as to be in practical effect part of it"); *Islam v. Lyft, Inc.*, 524 F. Supp. 3d 338, 356

(S.D.N.Y., Mar. 9,  2021) (holding that the "Section One exemption does not distinguish

between the interstate transportation of goods and passengers").

> **c.**     **Uber Drivers Engage in Interstate Commerce Through Both**
> **Interstate Travel and Intrastate Travel Within the Flow of**
> **Interstate Commerce.**

The limited discovery record in this case demonstrates that Uber drivers, both at the

nationwide level and in the New York Metro Area,[43] are transportation workers sufficiently

"engaged in interstate commerce" for purposes of the Section 1 exemption.  Two recent

decisions in this District, on even less developed records, properly applied the Section 1

exemption to drivers for rideshare companies like Uber, reasoning that such drivers perform

---

[43] Courts are split on the proper geographic scope of the class of workers for purposes of the
Section 1 exemption.  *Compare Davarci*, 2021 U.S. Dist. LEXIS 157948, at *17 (the relevant
class of workers is rideshare drivers nationwide) *with Haider*, 2021 U.S. Dist. LEXIS 62690, at
*8-9 (assessing both a nationwide class and New York City class for purposes of the exemption).
Plaintiff accordingly sought and obtained limited discovery for both nationwide Uber drivers as
well as New York Metro Area Uber drivers.  Plaintiff presents both sets of data here for the
record but primarily references the nationwide data.

interstate trips with sufficient regularity and frequency so as to be engaged in interstate commerce. *Islam*, 524 F. Supp. 3d at 352-53; *Haider*, 2021 U.S. Dist. LEXIS 62690, at *12. Both decisions faithfully construed the intent and expansive scope of Section 1's carve-out.

In *Islam*, Judge Abrams found that Section 1's applicability depends not on whether a particular class of workers "predominantly" or "primarily" engages in interstate commerce, but whether the class "perform[s] more than a *de minimis* amount of interstate transportation." 524 F. Supp. 3d at 351. The court correctly noted that even if only 2% of Lyft-facilitated trips involve crossing state lines, this "adds up to tens of millions of interstate rides in the United States each year," enough to represent "a regular component of [a driver's] day-to-day work." *Id.* at 352. The court also found persuasive the regularity with which rideshare drivers ferry passengers to and from transportation hubs like airports and train stations and Lyft's arrangements, like Uber's here, with airports and other hubs of interstate travel. *Id.* at 355.

In *Haider*, Judge Nathan concluded that "the sheer number of interstate trips rideshare drivers make" places them squarely within the flow of interstate commerce. 2021 U.S. Dist. LEXIS 62690, at *9. The holding extended to all rideshare drivers, regardless of geographic specificity. *Id.* First, the court concluded that drivers operating solely in the New York City area "transported passengers within the flower of interstate commerce," because Lyft's fare schedule "contemplates interstate travel," its service is marketed "as one allowing interstate travel," and its drivers physically cross state lines often enough to conclude that "interstate travel is a central component of Lyft's business in the tri-state area." *Id.* at *8. Second, the court also reached "the same conclusion when considering rideshare drivers as a class without regard to geography," holding that "interstate transportation generally constituted a "significant portion of Lyft's business." *Id.* at *9. Indeed, according to national data provided by Lyft, on the record, drivers ferry passengers across state lines twice a week, on average, totaling "millions of interstate fares

each year." *Id*. Citing *Kienstra*, the court declined to analyze whether individual drivers were performing interstate trips with adequate frequency. *Id*. at *10 ("[N]o class of transportation workers spends all its time straddling a state border.").

Consistent with the expansive scope with which "engaged in interstate commerce" has historically been construed, *Haider* further held that interstate travel was not "strictly necessary" to qualify a worker for exemption from the FAA. *Id*. at *11 (noting that when drivers make trips to "air, train, and bus terminals," they are essentially performing the intrastate transportation of passengers within the broader flow of commerce, and thereby engaging in interstate commerce) (internal citations omitted). As supporting context, the court noted that Lyft had "marketing partnerships with airlines and hotels, and it offers riders priority pick-ups at airports with a paid subscription." *Id*. at *12. Thus, both the numerosity and quality of Lyft's connections to interstate travel hubs allowed the Court to conclude that the company's drivers actively engage in interstate commerce "even when they do not personally cross state lines." *Id*. at *12-13.

Here, Uber driver data and documents compel the same conclusion. First, Uber drivers are engaged in the channels of interstate commerce by directly transporting a substantial number of passengers interstate and by earning an even more substantial percentage of their fares through such interstate trips. Second, Uber drivers are engaged in the channels of interstate commerce by transporting an even more substantial number of passengers both intrastate and interstate to transportation hubs such as airports, train stations, bus depots, and ferry terminals and by earning a significant percentage of their fares through such trips. Third, Uber seeks individuals with interstate transportation experience for the driver role and partners with airlines, airports, and cities to facilitate the flow of interstate commerce. Taken together, this evidence confirms that Uber drivers are "part of the stream of interstate commerce" and transport passengers as "an integral step in the interstate movement." *United States v. Yellow Cab Co.*, 332 U.S. 218, 228-29

(1947); *Rittman v. Amazon.com, Inc.*, 971 F.3d 904, 917 (9th Cir. 2020) (holding that AmFlex workers who complete intrastate "the delivery of goods that Amazon ships across state lines and for which Amazon hires AmFlex workers to complete the delivery . . . form a part of the channels of interstate commerce").

On an annual basis, from 2018 through November 9, 2021, between 2.1% and 2.5% of Uber drivers' trips nationwide crossed state lines.[44] Ex. A at 26. In real figures, that percentage translates to approximately 22-33 million annual interstate trips.[45] Any reasonable interpretation of "engaged in interstate commerce" must reach the drivers for a company that facilitates *more than 20 million interstate trips nationwide a year*. *See Kienstra*, 702 F.3d at 957-58 (concluding that delivery workers were engaged in interstate commerce even though under 2% of deliveries per year were interstate; *Islam*, 524 F. Supp. 3d at 352 (millions of interstate trips a year clearly constitute "a regular component of [a driver's] day-to-day work"); *Haider*, 2021 U.S. Dist. LEXIS 62690, at *9 (millions of interstate trips a year constituted a "significant portion of Lyft's business"); *Smith v. Allstate Power Vac, Inc.*, 482 F. Supp. 3d 40, 46 (E.D.N.Y., Aug. 26, 2020) (even if "plaintiff personally delivered waste in interstate commerce only twice … I would still find plaintiff exempt from the FAA").

---

[44] Moreover, Uber drivers nationwide earned between 4.7% and 5.8% of their gross total fares from interstate trips, suggesting that such trips form more than an incidental portion of their business. Ex. A at 30-31.

[45] In Uber's Form S-1 Registration Statement that it filed with the SEC on February 26, 2021, it stated that it facilitated approximately 5,220,000,000 trips worldwide in 2018, 6,904,000,000 trips worldwide in 2019, and 5,025,000,000 trips worldwide in 2020, and that, "As of December 31, 2020 … markets outside the United States accounted for approximately 79% of all Trips." *Uber Technologies, Inc.* Form S-1, February 26, 2021, at 21, 54, *available at*: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001543151/65457024-f641-4ce3-a796-ff1f69f435b5.pdf. Assuming, therefore, that 21% of worldwide trips occurred in the U.S., Uber's nationwide total trip numbers are 1,096,200,000 (2018), 1,449,840,000 (2019), and 1,055,250,000 (2020). The nationwide *interstate trip totals* are therefore 27,405,000 (2018), 33,346,320 (2019), and 22,160,250 (2020).

Similarly, in interpreting the reach of the Interstate Commerce Commission's power under the Motor Carrier Act, 49 U.S.C. § 301 *et seq.*, the Supreme Court found that even where interstate deliveries amounted to 3-4% of total carrier services provided by a company's employees, their work constituted "services rendered … in interstate commerce." *Morris v. McComb*, 332 U.S. 422, 432-33 (1947).[46]

In addition to directly transporting passengers interstate, Uber drivers also regularly transport passengers interstate and intrastate to and from airports, train stations, bus depots, and other interstate transit hubs, and earn a substantial percentage of their gross fares from such trips. *See supra* Section II.B., Uber Nationwide and NY Metro Driver Data. These trips unquestionably form part of the chain of interstate travel and commerce. *See Haider*, 2021 U.S. Dist. LEXIS 62690, at *11 (when drivers make trips to "air, train, and bus terminals," they are essentially performing the intrastate transportation of passengers within the broader flow of commerce, and thereby engaging in interstate commerce); *Waithaka v. Amazon.com, Inc*., 966 F.3d 10, 26 (1st Cir. 2020) (last-mile delivery drivers who never personally cross state lines qualify as transportation workers for Section 1 exemption purposes because they transport goods or people within the flow of interstate commerce).

### d.     Uber's Contrary Authority is Distinguishable.

In contrast to *Haider* and *Lyft,* another pair of recent decisions in this District has, contrary to the intent and history of the Section 1 exemption, improperly demanded that interstate transportation constitute the overwhelming majority of a rideshare service's business in

---

[46] *See also Brennan v. Schwerman Trucking Co.*, 540 F.2d 1200, 1202-03 n.9 (4th Cir. 1976) (reversing district court's conclusion that a trucking company's interstate activities were "insufficient" when its revenue per year stemming from interstate commerce ranged from 1.2% to 9.7%); *Barefoot v. Mid-America Dairymen, Inc.*, 826 F. Supp. 1046, 1049 n.2 (N.D. Tex., July 15, 1993) (activities were part of interstate transportation of goods where truck drivers made only 28 interstate deliveries over four years), *aff'd*, 16 F.3d 1216 (5th Cir. 1994).

order for its workers to be exempt. *See Aleksanian v. Uber Techs*., Inc., 524 F. Supp. 3d 251 (S.D.N.Y., Mar. 8, 2021); *Davarci* 2021 U.S. Dist. LEXIS 157948.

*Aleksanian* and *Davarci* follow in the wake of *Wallace*, which led to a slew of decisions[47] involving rideshare companies like Uber and Lyft that contravened *Kienstra's* position and the history and intent of the FAA and applied a quasi-centrality test to the interstate transportation of passengers. In doing so, these decisions recast the gargantuan, multi-billion dollar rideshare economy as a localized, geographically narrow industry, the drivers for which merely convey interstate passengers on an incidental or infrequent basis. *See, e.g.*, *Capriole*, 7 F.4th at 865 ("Given this background, Uber drivers, even when crossing state lines or transporting passengers to airports, are "merely convey[ing] interstate . . . passengers between their homes and [their destination] in the normal course of their independent local service." (citation omitted).[48]

In *Aleksanian*, the court adopted *Wallace's* holding that occasional interstate travel does not preclude a rideshare driver from the FAA's applicability. *Aleksanian*, 524 F. Supp. 3d at 262. *Davarci* relied on *Aleksanian's* flawed reasoning, dismissing as "merely incidental" the 2.5% of Uber's total trips that were interstate from 2015-2019. 2021 U.S. Dist. LEXIS 157948, at *27. Neither decision addressed more granular trip data—including airport or transit hub

---

[47] *See, e.g.*, *Capriole v. Uber Techs., Inc*., 7 F.4th 854, 865 (9th Cir. 2021); *Cunningham v. Lyft, Inc*., 2021 U.S. App. LEXIS 33010_ F.4th_, *at 17 (1st Cir. 2021); *Osvatics v. Lyft, Inc.*, 2021 U.S. Dist. LEXIS 77559, at *12 (D.D.C., Apr. 22, 2021) ("[W]hether a worker is engaged in . . . interstate commerce turns on whether interstate movement is a central part of the class members job description.") (citation and quotation marks omitted).

[48] *See also Rogers*, 452 F. Supp. 3d at 916 ("[Uber] is in the general business of giving people rides, not the particular business of offering interstate transportation to passengers."); *Cunningham,* 2021 U.S. App. LEXIS 33010, at *15 (holding that Lyft drivers do not "fit within the section 1 exemption [just] because some of them occasionally transport passengers across state lines"); *Singh*, 2021 U.S. Dist. LEXIS 225732, at *48 ("Uber drivers nationwide are in the general business of giving people [local] rides, not the particular business of offering interstate transportation to passengers, unlike railroad workers and seamen, whose jobs revolve around interstate travel/movement" (citation and quotation marks omitted); *Osvatics*, 2021 U.S. Dist. LEXIS 77559, at *43 ("trips provided by Lyft drivers are primarily local in nature.").

trips—or the significant fares or revenue earned by drivers as a percentage of their total fares when transporting passengers intrastate within the flow of interstate commerce. Given that Uber drivers engaged in approximately 22-33 million interstate trips nationwide each year in recent years, and the sheer extent to which app-based rideshare services have revolutionized passenger transportation, it is difficult to understand how companies like Uber and Lyft could be reduced to "technologically advanced local taxicab transport." *Aleksanian*, 524 F. Supp. 3d at 262.

*Davarci* reasons, incorrectly, that Uber drivers' role as facilitators of interstate commerce is merely "incidental" to their core role as local transport in the same way that bartenders' occasional role as "armchair psychologists" is merely "incidental" to their core role of tending bar, 2021 U.S. Dist. LEXIS 157948, at *27-28, but this misses the mark because Uber drivers' solely consists of constantly ferrying passengers to and from various locations, i.e., in transport and in the flow of commerce. There is no possible "workday" as a contractor where Uber drivers are not transporting passengers within the flow of commerce as a central component of their work. By contrast, it is easy to imagine a workday in which a bartender performs no "armchair psychologist" work; for example, if no patrons entered the bar on a particular day, or if the bartender was solely making drinks to be sent to patrons dining at tables or for takeout.

By excluding intrastate rides from the FAA exception and conditioning interstate trips' inclusion on their centrality to a driver's duties, these decisions have both arbitrarily differentiated rideshare drivers from seamen and railroad workers, and severely limited the scope of the Section 1 exemption.

### E. If New York Law Applies, Uber's Arbitration Clause is Void and Unenforceable.

Uber's arbitration clause is void under New York Law. Section 7515 of New York's Civil Practice Law and Rules ("CPLR") makes void any arbitration clause requiring arbitration

of any allegation or claim of discrimination, provided that result is not inconsistent with federal law. C.P.L.R. § 7515. Here, Uber seeks to arbitrate Plaintiff's claim that Uber discriminated against him in violation of the Fair Chance Act provisions of the NYCHRL. ECF No. 1 (Complaint) at ¶¶ 91-110. Preventing such arbitration would not be inconsistent with federal law because, as discussed above, Plaintiff and Uber rideshare drivers are transportation workers exempt from application of the FAA.

Uber's claim that "state law contains no prohibition against enforcement of voluntary Arbitration Provisions like the one at issue here" flatly contradicts § 7515. Moreover, none of the cases it cites involve discrimination claims. *See* ECF No. 43 at 9. Uber's claim that CPLR § 7515 is inapplicable to its arbitration agreement because Plaintiff had the opportunity to opt out is similarly unavailing. First, the plain text of § 7515 applies to "any clause or provision in any contract," and prohibits any clause "which requires as a condition of the enforcement of the contract or obtaining remedies under the contract that the parties submit to mandatory arbitration to resolve any allegation or claim of discrimination." CPLR § 7515(a)(2). There is no carve-out for contracts from which a signatory had the opportunity to opt out—once a party is bound by the contract, the statute applies to void unlawful arbitration clauses. *See id.* ("the provisions of such prohibited clause . . . shall be null and void").

Moreover, Uber obtained Plaintiff's signature on the PAA on January 7, 2020 (ECF No. 22-2, ¶ 15), four days *before* the NYCHRL became applicable to independent contractors like Plaintiff.[49] New York's legislature could not have expected workers to opt out of arbitration agreements in order to preserve rights they did not yet have. The statutory text supports this

---

[49] On Jan. 11, 2020, the NYCHRL begin encompassing independent contractors such as Uber drivers within its expansive protections against discrimination and unfair treatment. *See* N.Y.C. Admin. Code § 8-107(23) ("The protections of this chapter relating to employees apply to interns, freelancers and independent contractors.") (effective date Jan. 11, 2020).

reading: it contains both a provision prohibiting inclusion of prohibited arbitration clauses on a going-forward basis, and the provision, described above, voiding such clauses in existing contracts. Were workers expected to opt out of unlawful contracts, the former provision would be unnecessary. If the Court finds Plaintiff exempt from the FAA, the arbitration clause is unquestionably void under New York law and his claims must proceed in this Court.

### F. Uber's Class Action Waiver is Unenforceable Under New York Law.

The Court should likewise decline to enforce the class action waiver in Uber's arbitration agreement if New York law applies.[50] Because, for the reasons described above, the FAA does not apply,[51] the Court must consider whether New York law would find a class action waiver enforceable under these circumstances. Given the well-established barriers to pursuing small discrimination claims in individual proceedings, and the substantial benefit of aggregating claims where, as here, the plaintiff challenges a common unlawful practice, enforcing the class waiver would be against New York's public policy. This is particularly true because New York recognizes a fundamental right of workers to organize. *See* N.Y. Const. art. I, § 17 ("Employees shall have the right to organize and to bargain collectively through representatives of their own choosing."). Likewise, New York's State Labor Relations Act declares that it is the "public policy of the state to . . . protect employees in the exercise of full freedom of association, self-organization and designation of representatives of their own choosing for the purposes of collective bargaining, or other mutual aid and protection, free from the interference, restraint or coercion of their employers." N.Y. Lab. L. § 700. This Court should give effect to New York's stated public policy and decline to enforce Uber's class waiver.

---

[50] The parties agree that New York law applies if the Court finds that the FAA does not govern.
[51] In its briefing, Uber cites exclusively to cases involving applicability of class waivers in contracts governed by the FAA, but that caselaw is inapplicable here because Plaintiff is subject to the Section 1 exemption.

## V. CONCLUSION

For these reasons, the Court should deny Uber's motion and find that (a) Plaintiff is among a class of workers exempt from the FAA under the Section 1 exemption; (b) Uber's arbitration clause is therefore governed by New York law; (c) Uber's arbitration clause is void and unenforceable under New York law; and (d) Uber's class action waiver is void and unenforceable under New York law and public policy.

Dated: December 21, 2021
      New York, New York

**MOBILIZATION FOR JUSTICE, INC.**

By: */s/ Michael N. Litrownik*
     Michael N. Litrownik

Michael N. Litrownik
Carolyn Coffey
100 William Street, 6th Floor
New York, NY 10038
Tel: (212) 417-3858
Fax: (212) 417-3890
Email: mlitrownik@mfjlegal.org

**TOWARDS JUSTICE**

By: */s/ Juno Turner*
     Juno Turner

Juno Turner
David H. Seligman (admitted *pro hac vice*)
2840 Fairfax Street, Suite 200
Denver, CO 80207
Tel: (720) 295-8846
Fax: (303) 957-2289
Email: juno@towardsjustice.org

*Attorneys for Plaintiff and the Proposed Classes*