

100 William Street, 6th Floor
New York, NY 10038
Tel 212-417-3700
Fax 212-417-3890
www.mobilizationforjustice.org

June 13, 2022

**By ECF**
Hon. Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street, Room 701
New York, NY 10007-1312

      Re: *Golightly v. Uber Technologies, Inc.*, No. 21-cv-03005 (LJL)

Dear Judge Liman:

      We represent the Plaintiff and the proposed class in the above-referenced matter. We write, pursuant to this Court's order dated June 6, 2022, to address the impact of the United States Supreme Court's decision in *Southwest Airlines Co. v. Saxon*, No. 21-309 __ S. Ct.__, 2022 WL 1914099 (June 6, 2022), on Uber's pending motion to compel arbitration of Plaintiff's class action criminal history discrimination and fair credit reporting claims. The Supreme Court, in *Saxon*, clarified the meaning of the 9 U.S.C. § 1 exemption in a manner that reinforces why Uber drivers are a "class of workers engaged in foreign or interstate commerce."

      In *Saxon*, the Court considered whether an airline ramp supervisor whose work "frequently," but not always, involved loading and unloading airplane cargo belonged to a class of workers engaged in foreign or interstate commerce under § 1 of the Federal Arbitration Act ("FAA"). 2022 WL 1914099, at *3. The Court first rejected Saxon's contention that § 1 calls for an industry-wide approach and that she fell within the exemption because she worked for an airline. *Id.* at *3. Rather, according to the Court, § 1 looks at the nature of the work performed by the worker seeking the exemption, not at whether the worker's employer is engaged in interstate commerce as a general matter. Saxon therefore fell within the exemption if the class of workers to which she belonged was "engaged in interstate commerce" as part of their work. *Id.*

      Importantly, in answering that question, the Court did not require that Saxon demonstrate that she always or even predominately engaged in interstate commerce in the course of her work. Saxon was a supervisor, not a ramp agent whose work involved loading cargo onto planes daily. The Court nevertheless concluded that Saxon fell within the FAA's § 1 exemption because the class of workers to which she belonged "frequently" loads and unloads cargo, including by "fill[ing] in as ramp agents for up to three shifts per week." *Id.* at *4 (internal quotation marks omitted).

      Furthermore, the Court definitively concluded that to be "directly involved in transporting goods across state or international borders" a class of workers need not themselves cross those borders. *Id.* at *5. Rather, transportation workers must "be actively engaged in the transportation of . . . goods across borders via the channels of foreign or interstate commerce."

1

*Id.* (internal quotation marks omitted). Although airline ramp supervisors do not themselves cross state lines as part of their work, they are actively engaged in transportation across state lines, according to the Supreme Court, because they are "intimately involved with the commerce (*e.g.*, transportation) of that cargo." *Id.*

The *Saxon* decision reinforces that the question for this Court is not whether Uber, as a company, is engaged in interstate commerce, nor whether Plaintiff or Uber drivers in the NY Metro Area (or nationally) themselves always or ever cross state lines. Rather, the appropriate question is whether those drivers are (1) engaged in work that is "intimately involved" with the transportation of people[1] across state lines, and (2) whether they are engaged in that work "frequently." *Id.* at *4, *6.

Plaintiff and other Uber drivers, like Saxon, belong to a class of workers that is frequently engaged in work "intimately involved" with the transportation of people across state lines. Uber drivers in New York City (like Plaintiff) as well as Uber drivers nationally continuously transport cargo—here, passengers—across state lines as well as intrastate within the flow and channels of interstate commerce. ECF No. 44 (Pl's Br.) at 4-7.

This conclusion is amply supported by Uber's own data, which demonstrate that, in each of the three years prior to his termination, more than three percent of Plaintiff's Uber trips actually involved crossing state lines, and up to 10 percent of his gross fares were earned on such trips. *Id.* at 6. These percentages are roughly the same for all Uber drivers in the NY Metro Area. *Id.* at 5. Moreover, Plaintiff and Uber drivers both nationally and in the NY Metro Area engaged in an even higher percentage of airport trips and earned a much higher percentage of their gross fares from such trips.[2] Even if airport trips or trips to train stations do not involve crossing state lines, they are intimately connected with the transportation of passengers across state lines. There can be little dispute, then, that Uber drivers, like airport cargo supervisors, are at least *frequently* "directly involved in transporting goods across state or international borders" and therefore "fall[] within §1's exemption." *Saxon*, 2022 WL 1914099, at *5.

As the Supreme Court recognized, however, there may be cases of difficult line drawing. For example, the Court cited to *Wallace v. GrubHub Holdings, Inc.*, 970 F.3d 798 (7th Cir. 2020), in which the Seventh Circuit concluded that GrubHub drivers do not fall within the § 1 exemption. *Saxon*, 2022 WL 1914099, at *5 n.2. But the *Wallace* plaintiffs argued that they fell within § 1 because they were connected to goods that had moved in interstate commerce. The Seventh Circuit explained that a transportation worker "must be connected not simply to the

---

[1] As discussed in Plaintiff's Memorandum of Law in Opposition to Uber's Motion to Compel Arbitration, there is no meaningful difference for purposes of this analysis between those workers who transport goods and those, like Plaintiff, who transport passengers. *See* ECF No. 44 (Pl's Br.) at 16-17.

[2] The yearly average for gross fares from airport trips made nationally between 2018 and 2021 was nearly 18%; for NY Metro Area drivers in the same time period nearly 13.5%; and for Plaintiff it was over 30% (from 2018-2020). *Id.* at 4-6. Of course, the Covid-19 pandemic drastically reduced airline travel from March 2020 through portions of 2021, reducing the number of airport trips in 2020 and 2021.

goods, but to the act of moving those goods across state or national borders." *Wallace*, 970 F.3d at 802. Whether the goods have been or ultimately will go to another state or country is not important except to the extent the class of workers directly progresses them on that journey.

      Airplane cargo loaders like Saxon are essential to progressing commerce in a way distinct even from other airline employees. Likewise, Uber drivers like Plaintiff are essential to that movement in a way distinct from other Uber employees—such as the software engineers who designed and maintain Uber's labor platform or the driver support representatives who assist drivers with any issues related to their travel and use of the platform. And they are distinct from delivery drivers, like the plaintiff in *Wallace*, who move goods intrastate. Uber drivers—especially those in New York City covered by New York City's Fair Chance Act—are actively involved in moving people across state lines either because they transport them across the Tri-State Area themselves or because they play an integral part in bringing those passengers to airports, from where they will cross state lines. For these reasons, the Court should deny Uber's motion to compel arbitration.

      We thank the Court for its attention to this matter.

Respectfully submitted,

*/s/ Michael N. Litrownik*
Michael N. Litrownik
*Attorney for Plaintiff and the Proposed Class*

cc: All counsel of record by ECF