UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                               :

GOLIGHTLY, *on behalf of himself and all others*    :
*similarly situated*,                              :

                       Plaintiff,    :          21-cv-3005 (LJL)
                                    :

             -v-                    :        OPINION AND ORDER
                                    :

UBER TECHNOLOGIES, INC., *et al.*          :
                                    :

                     Defendants.   :

------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendant Uber Technologies, Inc. ("Uber") moves to compel individual arbitration and

to dismiss the complaint or, in the alternative, to strike plaintiff Job Golightly's class allegations,

and to stay proceedings. Dkt. Nos. 21, 22, 43.

      For the following reasons, the motion to compel individual arbitration is granted. The

Court stays the action with respect to Job Golightly's claims against Uber.

## BACKGROUND

      The following facts are taken from the complaint and the evidence submitted in

connection with the present motion to compel arbitration.

### I.    Present Action

      On April 8, 2021, Job Golightly ("Plaintiff") initiated the present action through the filing

of a class action complaint. Dkt. No. 1. Plaintiff is a Black resident of the Bronx, New York

who worked as a driver for Uber from 2014 until August 2020. *Id.* ¶ 10. In August of 2020,

Plaintiff was deactivated from Uber's driving platform, without notice, process, or further

communication, after Uber discovered, through a background check, that he had a 2013

misdemeanor speeding ticket from Virginia. *Id.* ¶ 11. If Plaintiff had received the same speeding ticket in New York, it would not have been characterized as a misdemeanor. *Id.*

Plaintiff brings a number of claims, both on behalf of himself and others, asserting that Uber's actions violate Plaintiff's and other drivers' rights under New York City Human Rights Law ("NYHRL") and the federal and New York Fair Credit Reporting Acts. *Id.* The NYHRL protections include the Fair Chance Act, which provides important protections to those with criminal histories to ensure that they are not unfairly discriminated against in the job market and helps to promote racial justice. *Id.* ¶¶ 8–9. Specifically, Plaintiff alleges that "Uber's unlawful policy of using criminal history to summarily deactivate current drivers from its labor platform or reject new drivers without even attempting to comply with the Fair Chance Act process [] disparately impacts hundreds of Black and Latinx individuals, like Mr. Golightly, who drove or hoped to drive for Uber, and who have disproportionately higher rates of criminal history due to the overcriminalization of communities of color." *Id.* ¶ 17.

On January 7, 2020, however, Plaintiff entered into a January 6, 2020 Platform Access Agreement (the "2020 PAA") through Uber's application for drivers ("Driver App") in order to continue to provide transportation services for Uber. Dkt. No. 22-1 at 3; Dkt. No. 44 at 4. The 2020 PAA contains an optional arbitration clause that purports to cover this dispute; Plaintiff did not opt out. Dkt. No. 22-1 at 3–5; Dkt. No. 44 at 4. That arbitration clause includes a class action waiver. Dkt. No. 22-1 at 4; Dkt. No. 44 at 4.

The parties agree that the Federal Arbitration Act ("FAA") governs the arbitration provision unless Plaintiff demonstrates that he is exempt from the FAA pursuant to the residual clause of Section 1 of the FAA. Dkt. No. 22-1 at 7; Dkt. No. 44 at 1, 4. Section 1 of the FAA, discussed in more detail below, exempts "contracts of employment of seamen, railroad

employees, *or any other class of workers engaged in foreign or interstate commerce*" from the

FAA.  9 U.S.C. § 1 (emphasis added).

## II.       Uber and Trip Statistics

Uber is a technology company that, among other services, matches individuals in need of

a car ride with drivers.  Dkt. No. 22-2 ¶¶ 4–5.  Uber operates in 150 cities across the United

States.  *Id.* ¶ 5.  Riders who wish to use Uber's services download Uber's application for riders,

while drivers willing to provide transportation services through Uber download Uber's Driver

App.  *Id.* ¶ 6.  The software in the apps matches riders and drivers based on their location.  *Id.*  In

nearly all cities where Uber is available, riders are able to schedule a ride within a 10-minute

pick-up window anywhere from five minutes to thirty days in advance.  Dkt. No. 45-1 at 50.  If

there is no driver available to complete the scheduled trip, the rider is notified.  *Id.*

The vast majority of Uber trips are intrastate.  Dkt. No. 22-4 ¶ 4.  For Uber trips taken

between January 1, 2018 and December 31, 2020, the average distance was approximately six

miles and the average duration was approximately sixteen minutes.  *Id.*  Nationwide, the

percentages of trips arranged using Uber's Driver App that were interstate for the years 2018 to

2021 were 2.5%, 2.3%, 2.1%, and 2.2%, respectively.  Dkt. No. 45-1 at 23–25.  The percentages

of trips that were interstate arranged using Uber's Driver App in New York City, New York City

Suburbs (*e.g.*, Long Island, Westchester, and surrounding counties), New Jersey, and

Connecticut (collectively, the "NY Metro Area") for the years 2018 to 2021 were 3.0%, 2.9%,

2.3%, and 2.7%, respectively.  *Id.* at 25.  Nationally, the percentages of gross fares for Uber

drivers derived from interstate travel nationally for the years 2018 to 2021 were 5.8%, 5.5%,

4.6%, and 4.7%, respectively.  *Id.* at 31.  The percentages of driver gross fares that were derived

from interstate trips in the NY Metro Area for the years 2018 to 2021 were 11.2%, 10.1%, 7.7%, and 8.1%, respectively.  *Id.*

Nationally, the percentages of airport trips arranged using Uber's Driver App for the years 2018 to 2021 were 9.4%, 10.1%, 7.3%, and 8.7%, respectively.  *Id.* at 33.  The percentages of airport trips arranged using Uber's Driver App in the NY Metro Area for the years 2018 to 2021 were 6.6%, 7.2%, 3.9%, and 4.6%, respectively.  *Id.* at 34–35.  Nationally, the percentages of driver gross fares derived from airport trips for the years from 2018 to 2021 were 19.9%, 20.4%, 14.2%, and 16.6%, respectively.  *Id.* at 38.  The percentages of driver gross fares derived from airport trips in the NY Metro Area from 2018 to 2021 were 16.9%, 17.7%, 9.0%, 10.3%, respectively.  *Id.*

The table below presents the percentages of Uber trips in the NY Metro Area terminating at each of the following locations:

|  | **2018** | **2019** | **2020** | **2021 (through Nov. 9, 2021)** |
|---|---|---|---|---|
| GWB Bus Station | 0.01% | 0.01% | 0.01% | 0.01% |
| Grand Central Terminal | 0.15% | 0.14% | 0.11% | 0.14% |
| Manhattan Cruise Terminal | 0.01% | <0.01% | <0.01% | <0.01% |
| Penn Station (includes Moynihan Train Hall) | 0.33% | 0.29% | 0.24% | 0.26% |
| Pier 11 | 0.01% | 0.01% | 0.01% | 0.01% |
| Pier 79 | 0.02% | 0.02% | 0.01% | 0.01% |
| Port Authority Midtown Bus Terminal | 0.09% | 0.07% | 0.06% | 0.06% |
| Red Hook Cruise Terminal | <0.01% | <0.01% | <0.01% | <0.01% |
| Total Percentage of Trips to All of These Locations | 0.63% | 0.54% | 0.44% | 0.49% |

| | | | | |
|---|---|---|---|---|
| as Percentage of All NY Metro Area Trips | | | | |

*Id.* at 41–42.  The table below presents the percentages of gross fares for Uber drivers in the NY

Metro Area for trips terminating at each of the following locations:

| | 2018 | 2019 | 2020 | 2021 (through Nov. 9, 2021) |
|---|---|---|---|---|
| GWB Bus Station | 0.01% | 0.01% | 0.01% | 0.01% |
| Grand Central Terminal | 0.16% | 0.17% | 0.11% | 0.14% |
| Manhattan Cruise Terminal | 0.01% | <0.01% | <0.01% | <0.01% |
| Penn Station (includes Moynihan Train Hall) | 0.36% | 0.39% | 0.26% | 0.27% |
| Pier 11 | 0.01% | 0.01% | 0.01% | 0.01% |
| Pier 79 | 0.02% | 0.02% | 0.01% | 0.01% |
| Port Authority Midtown Bus Terminal | 0.11% | 0.10% | 0.08% | 0.08% |
| Red Hook Cruise Terminal | <0.01% | <0.01% | <0.01% | <0.01% |
| Total Percentage of Trips to All of These Locations as Percentage of All NY Metro Area Trips | 0.68% | 0.71% | 0.48% | 0.52% |

*Id.* at 46.

Despite the existence of some number of interstate trips, Uber's advertising and

marketing materials do not address interstate trips.  Dkt. No. 45-1 at 12.  Uber also does not

maintain any guidelines, policies, or practices applicable to drivers that concern interstate trips.

*Id.* at 14.  Riders who take trips between New York City and New Jersey are charged a

surcharge, which Uber states is due to state and local regulations.  Dkt. No. 43 at 7–8; Dkt. No.

43-1.  Uber also has no partnerships or arrangements with Amtrak, any airline, or any motorcoach company.  Dkt. No. 45-1 at 16.

## PROCEDURAL HISTORY

Plaintiff initiated this action through the filing of a complaint on April 8, 2021, asserting claims against Uber and Checkr, Inc. ("Defendants").  Dkt. No. 1.  On June 2 and 16, 2021, Checkr, Inc. and Uber, respectively, filed letters to inform the Court that they intended to move to compel arbitration.  Dkt. No. 15.  On June 23, 2021, the parties filed a proposed case management plan.  Dkt. No. 18.  Uber took the position that the Court should rule on its arbitration motion before engaging in substantive discussions regarding discovery and case scheduling.  *Id.*  On June 30, 2021, the Court issued an order allowing Plaintiff to conduct limited discovery in the form of document requests and interrogatories in support of its argument that it was exempted from application of the FAA pursuant to Section 1 of the FAA.  Dkt. No. 19.  The Order also permitted Defendants to move to stay all remaining discovery in conjunction with their consolidated motion to compel arbitration and stayed Plaintiff's time to respond to any motion to compel arbitration pending a ruling on the motion to stay discovery. *Id.*  On August 4, 2021, Checkr, Inc. was voluntarily dismissed from the action, leaving Uber as the only remaining defendant.

On July 19, 2021, Uber moved to compel individual arbitration, dismiss the lawsuit (or alternatively, to strike Plaintiff's class allegations), and stay discovery.  Dkt. No. 22.  In that motion, Uber argued that Plaintiff's claims are subject to arbitration and are not exempt under Section 1 of the FAA as a matter of law.  *Id.*; 9 U.S.C. § 1.  Specifically, Uber argued that the Section 1 exemption does not apply because Uber drivers are not engaged in interstate commerce as the nature of their trips are primarily local, the relevant contract between Uber and Plaintiff is not a contract of employment but instead a licensing agreement, and Uber drivers transport

passengers, not goods.  Dkt. No. 22-1 at 7–16.  Uber also argued that discovery was unnecessary as Uber's motion to compel arbitration establishes, as a matter of law, that the parties must arbitrate Plaintiff's claims.  *Id.* at 33.  On July 30, 2021, Plaintiff filed a memorandum of law in opposition to Uber's motion to stay discovery.  Dkt. No. 25.  On August 4, 2021, Uber filed a reply memorandum of law in further support of its motion to stay discovery.  Dkt. No. 29.

On August 11, 2021, the Court issued an Opinion and Order denying Uber's motion to stay discovery.  *See generally* Dkt. No. 30.  The Court noted that neither party disputed, for purposes of the discovery motion, that Plaintiff's claim was subject to arbitration unless Plaintiff was one of a class of workers under the "residual clause" of the FAA, which exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" from its reach.  *Id.* at 2; 9 U.S.C. § 1.  The Court stated that the contract Plaintiff entered into with Uber "contains an arbitration provision that would cover this dispute" and "contains a class waiver."  Dkt. No. 30 at 3.  After concluding that a valid arbitration clause existed, the Court dismissed Uber's argument that the residual clause of the FAA would not apply because Uber drivers transport passengers, not goods.  *Id.*  Quoting a district court opinion by then-Judge Jackson, the Court stated that "[t]he Section 1 'exemption' 'is not limited to classes of workers who transport goods in interstate commerce,' but also 'extend[s] to the transportation of passengers as well as physical goods.'"  *Id.* (quoting *Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 13 (D.D.C. 2021)).  The Court then noted that courts were divided on whether Uber and Lyft drivers fall within the residual clause, there was no Second Circuit precedent directly on point, and Plaintiff had not had the opportunity to present evidence on the issue.  *Id.* at 3–4.

The Court thus concluded that Uber's request for arbitration could not be determined based on the allegations of the complaint and the documents incorporated therein, as it ultimately depended on whether Plaintiff was a "transportation worker" for purposes of the residual clause. *Id.* at 7–8.  The Court stated that Plaintiff's requested discovery was narrow and Uber had not demonstrated any prejudice it would suffer from responding to the limited discovery requests. *Id.* at 8.  The Court also noted that while Uber's position may ultimately be meritorious, Uber had not demonstrated that the merit of its position was self-evident.  *Id.* at 9.  Specifically, the Court stated that the case law makes clear that the applicability of the Section 1 residual clause does not depend alone on the frequency of interstate trips taken by a class of workers, but might also be applied when the transportation of people and goods was solely intrastate but was part of the "stream of interstate commerce."  *Id.* at 10 (quoting *United States v. Yellow Cab Co.*, 332 U.S. 218, 228–29 (1947)).  The Court, however, noted in a footnote that it did not prejudge whether and how Uber workers would fall within Section 1 and left "open for briefing after the limited discovery the precise standards the Court should adopt in measuring the reach of Section 1 and the application of those standards to the facts."  *Id.* at 10 n.5.  For these reasons, the Court denied the motion to stay discovery and noted that it would return to Uber's motion to compel arbitration following limited discovery.  *Id.* at 12.

Limited discovery was conducted, and Uber subsequently filed a supplemental memorandum of law in support of its motion to compel on November 29, 2021.  Dkt. No. 43. On December 21, 2021, Plaintiff filed a memorandum of law and declaration in opposition to the motion to compel.   Dkt. Nos. 44–45.  On January 10, 2022, Uber filed a reply memorandum of law in further support of its motion to compel.  Dkt. No. 46.

On June 6, 2021, the Court asked the parties to file letter briefs addressing the impact, if any, on the pending motion to compel arbitration of the Supreme Court's recent decision in *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1784 (2022).  Dkt. No. 47.  On June 13, 2022, both parties filed letter motions addressing *Saxon*.  Dkt. Nos. 48–49.

## LEGAL STANDARD

### I.    Motion to Compel Arbitration

When deciding a motion to compel arbitration, courts apply a standard "similar to that applicable for a motion for summary judgment."  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)).  On a motion for summary judgment, courts consider "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," and draw "all reasonable inferences in favor of the non-moving party."  *Id.* (cleaned up).  Summary judgment is appropriate where "there is no genuine issue as to any material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)).

"Once the existence of a valid arbitration agreement has been established, [] 'the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.'"  *Osvatics*, 535 F. Supp. 3d at 9 (quoting *Sakyi v. Estée Lauder Cos.*, 308 F. Supp. 3d 366, 375 (D.D.C. 2018)).  "Thus, the party claiming that section 1 exempts an arbitration agreement from the FAA's coverage bears the burden of proving that the exemption applies."  *Id.*; *see Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010) ("A party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid."); *Capriole v. Uber Techs., Inc.*, 460 F. Supp. 3d 919,

928 (N.D. Cal. 2020), *aff'd*, 7 F.4th 854 (9th Cir. 2021) ("As the party opposing arbitration, Plaintiffs have the burden of proving that the exemption applies.").

## II.        The Federal Arbitration Act

"Section 2 of the Federal Arbitration Act (FAA) makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Haider v. Lyft, Inc.*, 2021 WL 1226442, at *2 (S.D.N.Y. Mar. 31, 2021) (Nathan, J.) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011)).  The FAA signifies a "liberal federal policy favoring arbitration agreements." *Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655, 660 (2d Cir. 2022); *see Capriole*, 7 F.4th at 868.  As the Supreme Court has stated, "the FAA was a response to hostility of American courts to the enforcement of arbitration agreements, a judicial disposition inherited from then-longstanding English practice." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001).

But, while the scope of the FAA is broad, "like most laws," the FAA "bears its qualifications." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 536 (2019).  At issue, here, is Section 1 of the FAA.  Section 1 provides that the FAA shall not apply "to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1; *see Cir. City Stores, Inc.*, 532 U.S. at 112.  The Supreme Court has surmised that the purpose behind this exception was that "[b]y the time it adopted the Arbitration Act in 1925, Congress had already prescribed alternative employment dispute resolution regimes for many transportation workers" and "it seems Congress 'did not wish to unsettle' those arrangements in favor of whatever arbitration procedures the parties' private contracts might happen to contemplate." *New Prime Inc.*, 139 S. Ct. at 537 (citation omitted).

The Supreme Court has discussed the scope of this exception on several different occasions. *See, e.g.*, *Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022); *New Prime Inc.*, 139 S. Ct. 532; *Cir. City Stores, Inc.*, 532 U.S. 105.  Notably, in *Circuit City*, the Court held that the residual part of the exception—*i.e.*, "any other class of workers engaged in foreign or interstate commerce"—does not exclude "all employment contracts" from the FAA's reach but instead exempts "only contracts of employment of transportation workers."[1]  532 U.S. at 114–19 (quoting 9 U.S.C. § 1).  In reaching this holding, the Court reasoned that the "wording of § 1 calls for the application of the maxim *ejusdem generis*, the statutory canon that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Id.* at 114–15 (cleaned up).  The Court then stated that "[u]nder this rule of construction the residual clause should be read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it."  *Id.* at 115.

In its decision, the Court also elaborated on the meaning of the language "engaged in foreign or interstate commerce" contained in the residual clause.  *Id.*  The Court stated that "even if the term 'engaged in commerce' stood alone in § 1, we would not construe the provision to exclude all contracts of employment from the FAA."  *Id.*  The Court explained that the specific modifier Congress uses to the word "commerce" in a particular statute is relevant to the statute's scope.  *Id.*  Specifically, while the phrase "involving commerce" "signals an intent to exercise

---

[1] Plaintiff appears to argue that *Circuit City* was wrongly decided, and the Supreme Court improperly restricted the residual clause of Section 1 in *Circuit City*.  Dkt. No. 44 at 13–14.  This Court, however, is bound by the decisions of the Supreme Court.  *See Hoeffner v. D'Amato*, 2022 WL 1912942, at *9 (E.D.N.Y. June 2, 2022).

Congress' commerce power to the full," the specific phrase "engaged in commerce" is "understood to have a more limited reach." *Id.* (quoting *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 277 (1995).

Within the last year, both the Supreme Court and the Second Circuit have decided cases raising the issue of what exactly it means to be a "transportation worker" engaged in interstate commerce under *Circuit City*. *See Saxon*, 142 S. Ct. 1783; *Bissonnette*, 49 F.4th 655.  In *Saxon*, the Supreme Court held that an airline ramp supervisor for Southwest Airlines whose "work frequently require[d] her to load and unload baggage, airmail, and commercial cargo on and off airplanes that travel across the country" fell within the Section 1 exemption.  *Saxon*, 142 S. Ct. at 1787.  First, the Court held that "class of workers" within Section 1 is defined based on what a person does at a specific company, not what the company does generally.  *Id.* at 1788.  Thus, the fact that a person works for a company that is generally engaged in interstate commerce does not by that fact alone make that person a transportation worker under Section 1 of the FAA.  Second, the Court stated that, based on the text of the statute, "any class of workers directly involved in transporting goods across state or international borders falls within § 1's exemption," and cargo "loaders exhibit this central feature of a transportation worker."  *Id.* at 1789.  In particular, the Supreme Court reasoned:

> [O]ne who loads cargo on a plane bound for interstate transit is intimately involved with the commerce (*e.g.*, transportation) of that cargo.  There could be no doubt that interstate transportation is still in progress, and that a worker is engaged in that transportation, when she is doing the work of unloading or loading cargo from a vehicle carrying goods in interstate transit.

*Id.* at 1790 (cleaned up).  The Court, however, stated in a footnote that it was not addressing whether a "class of workers [who] carries out duties further removed from the channels of interstate commerce or the actual crossing of borders," such as "last leg delivery drivers" or

"food delivery drivers," fell within Section 1's ambit. *Id.* at 1789 n.2 (internal quotation marks and citations omitted).

Following *Saxon*, the Second Circuit issued a revised opinion in *Bissonnette*, a case which raised the issue of whether truck drivers who delivered baked goods to stores and restaurants on behalf of a bakery were transportation workers under Section 1 of the FAA. 49 F.4th 655. The Second Circuit held that they were not, noting that the term "transportation worker" in the FAA was defined "by affinity" and that the two examples that the FAA gave— *i.e.*, "seamen" and "railroad employees"—are "telling because they locate the 'transportation worker' in the context of a transportation industry." *Id.* at 660. Thus, the court concluded that "an individual works in a transportation industry if the industry in which the individual works pegs its charges chiefly to the movement of goods or passengers, and the industry's predominant source of commercial revenue is generated by that movement" and "[b]ecause the plaintiffs do not work in the transportation industry, they are not excluded from the FAA." *Id.* at 661–62.

The decisions addressing the Section 1 exemption also make clear that when applying Section 1, courts should look not to the individual conduct or experience of the plaintiff, "but whether *the class of workers to which the complaining worker belonged* engaged in interstate commerce." *Capriole*, 7 F.4th at 861 (quoting *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 800 (7th Cir. 2020) (Barrett, J.)); *Davarci v. Uber Techs., Inc.*, 2021 WL 3721374, at *9 (S.D.N.Y. Aug. 20, 2021) ("[T]he Court focuses its analysis on the overall class of workers to which Plaintiffs belong, *i.e.*, Uber drivers nationwide."); *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 915 (N.D. Cal. 2020) ("The plaintiffs' personal exploits are relevant only to the extent they indicate the activities performed by the overall class."). Accordingly, a person may occasionally

provide transportation services in interstate commerce but not be part of *a class of transportation workers* engaged in foreign or interstate commerce.  *See Bissonnette*, 49 F.4th 655.

## DISCUSSION

The fundamental question at issue is whether Plaintiff belongs to a "class of workers engaged in foreign or interstate commerce," such that he is exempt from the FAA pursuant to Section 1.  9 U.S.C. § 1.  The parties do not dispute that Uber drivers are transportation workers for purposes of Section 1 of the FAA.  Instead, they largely dispute whether Uber drivers are transportation workers "engaged in foreign or interstate commerce" based on the facts that they conduct some interstate trips and drive people to and from airports, train stations, and other primarily interstate modes of travel.  9 U.S.C. § 1.  The issue is consequential.  Plaintiff's claims raise a question of substantial public importance.  There is a public good in the question of the legality and discriminatory impact of Uber's background check policies being aired publicly and resolved by an official who enjoys judicial independence.  At the same time, there is a public interest in the enforcement of agreements voluntarily reached between two parties, even when that agreement will result in one or the other party being denied a federal court forum with respect to a dispute that arises between them.

There is no Supreme Court or Second Circuit opinion directly on point.[2]  Several other Circuit Courts and courts in this District, however, have addressed this issue or a substantially similar one and have come out on both sides.  For example, both the First and Ninth Circuits have held that Lyft and "Uber drivers, as a nationwide 'class of workers,' are not 'engaged in foreign or interstate commerce' and are therefore not exempt from arbitration under the FAA." *Capriole*, 7 F.4th at 863 (quoting 9 U.S.C. § 1); *see Cunningham v. Lyft, Inc.*, 17 F.4th 244, 253

---

[2] A case presently before the Second Circuit raises this issue and is scheduled for argument on February 6, 2023.  *Aleksanian v. Uber Technologies Inc.*, 22-98 (2d Cir.).

(1st Cir. 2021).  On the other hand, the Seventh Circuit has held that truck drivers who occasionally transport loads interstate are interstate transportation workers within Section 1 of the FAA.  *See Int'l Bhd. of Teamsters Loc. Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 957 (7th Cir. 2012); *see also Islam v. Lyft, Inc.*, 524 F. Supp. 3d 338, 342 (S.D.N.Y. 2021) (finding Lyft drivers exempt under Section 1 of the FAA).  But, while courts are split on this issue, the majority of courts hold that Uber or Lyft drivers[3] are not exempt from the FAA's coverage under Section 1.  *See, e.g.*, *Capriole*, 7 F.4th at 861 ("[W]e join the growing majority of courts holding that Uber drivers as a class of workers do not fall within the 'interstate commerce' exemption from the FAA."); *Osvatics*, 535 F. Supp. 3d at 12 ("A majority of courts faced with this question have concluded that rideshare drivers do not fall within the section 1 residual clause.") (collecting cases); *Golightly v. Uber Techs., Inc.*, 2021 WL 3539146, at *3 (S.D.N.Y. Aug. 11, 2021) (collecting cases).

Although this is a close case, the Court ultimately agrees with the majority of courts and concludes, based on the evidence in front of it, that Uber drivers are not a "class of workers engaged in foreign or interstate commerce" within Section 1 of the FAA.  9 U.S.C. § 1.  Thus, Plaintiff's claims are not exempt from the FAA pursuant to the residual clause and Uber's motion to compel individual arbitration is granted.[4]

---

[3] For purposes of this motion, neither side argues that there is a material difference between a Lyft driver and an Uber driver.

[4] Because the Court concludes that Uber drivers are not transportation workers engaged in interstate commerce under Section 1, the Court does not address Uber's argument that Plaintiff may not rely on the exclusionary clause in Section 1 of the FAA because the 2020 PAA is not a "contract of employment," but instead a licensing agreement.  Dkt. No. 22-1 at 16.  The Court, however, is skeptical of this argument as the Supreme Court has defined the term "contracts of employment" broadly.  *See New Prime Inc.*, 139 S. Ct. at 541 ("Congress used the term 'contracts of employment' in a broad sense to capture any contract for the performance of *work* by *workers*." (quoting 9 U.S.C. § 1)).  Moreover, Uber fails to identify any court that has agreed with this argument.

I.      **Motion to Compel**

In determining whether Section 1 applies, courts generally start by determining the scope of the relevant "class of workers" to which the plaintiff belongs.  *See Capriole*, 7 F.4th at 862; *Davarci*, 2021 WL 3721374, at *8.  Plaintiff here is an Uber driver in New York City and brings his claims on behalf of certain Uber drivers in New York City.  Dkt. No. 1 ¶ 82.  However, despite the class definition in the complaint, Uber argues that the inquiry for purposes of Section 1's application is whether Plaintiff was "part of a class of workers who, *at a nationwide level*, engage in interstate commerce as a central part of their job description."  Dkt. No. 43 at 2 (emphasis added).  Plaintiff does not appear to disagree; despite noting that "[c]ourts are split on the proper geographic scope of the class of workers for purposes of the Section 1 exemption," Plaintiff primarily focuses on "nationwide data" in its opposition brief.  *See* Dkt. No. 44 at 17 n.45.

Courts are largely in agreement that the proper geographic scope of the class of workers for purposes of Section 1 is nationwide.[5]  *See Capriole*, 7 F.4th at 862 ("[A]ll courts addressing this question, even those that have ultimately concluded that Uber drivers do fall within the interstate commerce exemption, have rejected attempts to cabin their analyses to a specific geographic area."); *Davarci*, 2021 WL 3721374, at *8; *Osvatics*, 535 F. Supp. 3d at 15; *Islam*,

_____

The Court previously rejected Uber's argument that the Section 1 exemption does not apply because Plaintiff transports people, not goods, in its August 11, 2021 Opinion and Order. Dkt. No. 30 at 3 ("The Section 1 exemption is not limited to classes of workers who transport goods in interstate commerce, but also extends to the transportation of passengers as well as physical goods." (cleaned up)).

[5] This Court declines to address a "challenging side question that no court seems to have grappled with to date" as to whether the relevant class for purposes of considering the exemption under the FAA is Uber drivers nationwide or rideshare drivers.  *Osvatics*, 535 F. Supp. 3d at 16 n.8.  Neither of the parties argue in favor of the latter definition of the class or argue that there is a meaningful difference among rideshare companies that would impact the analysis if the Court were to adopt the latter definition of the class for purposes of the Section 1 exemption.  Thus, the Court declines to resolve this issue.

524 F. Supp. 3d at 350.  Those courts state that this conclusion "follows from the text and structure of the section 1 exemption."  *Osvatics*, 535 F. Supp. 3d at 15.  Because the scope of the residual clause should be interpreted in connection with the company it keeps—specifically, the words "seamen" and "railroad employees," 9 U.S.C. § 1; *see Saxon*, 142 S. Ct. at 1789; *Bissonnette*, 49 F.4th at 660, and neither of these "class[es] of workers" are defined by any geographic scope, courts have concluded that "the most natural inference is that Congress intended those terms to encompass all seamen and railroad employees nationwide."  *Id.*; *see Davarci*, 2021 WL 3721374, at *8.

The Court pauses to note that such an absolute, unqualified rule is not free from question. In the Supreme Court's decision in *Saxon* and the Second Circuit's decision in *Bissonnette*, the courts looked not only to the plaintiffs' job titles but also to the plaintiffs' specific job responsibilities and job descriptions in determining whether they were part of a class of workers engaged in interstate commerce under Section 1 of the FAA.  *Saxon*, 142 S. Ct. at 1789; *Bissonnette*, 49 F.4th at 662.  Depending on how a company doing business nationwide organizes its workforce and how and whether the nature of the work performed differs from region to region, it might be more faithful to the FAA exemption to consider the employee as a member of a more local class.  An employer should not be able to defeat the employee's right to litigate by the contrivance of grouping him with a number of other persons who bear the same job title but whose work otherwise bears no resemblance to the work the employee does.

The Court, however, need not adopt an absolute rule now to resolve this case.  Uber argues and Plaintiff appears to concede that the relevant class of workers is nationwide Uber drivers for purposes of whether Section 1's residual clause applies.  *See* Dkt. No. 43 at 2; Dkt. No. 44 at 17 n.45.  Plaintiff does not claim that Uber's agreements with its drivers are anything

but uniform nationwide and no party argues that the essential job responsibilities differ from one

state to another.  The Court therefore concludes, on the record in front of it, that the relevant

"class of workers" for determining whether the Section 1 exemption applies is nationwide Uber

drivers.  Moreover, as discussed in more detail below, even if this Court were to find that the

relevant class of workers was New York Uber drivers, Plaintiff has not presented any evidence

that the nature of the job description or the nature of the work of an Uber driver nationally differs

materially from that of New York State or New York City Uber drivers.  Thus, the Court would

still conclude that Plaintiff does not fall within Section 1's residual clause.

The next question is whether Uber drivers are engaged in interstate commerce.  In

support of their argument that they are, Plaintiff points to the following evidence: (i) statistical

evidence that Uber drivers transport a number of passengers to transportation hubs such as

airports, train stations, bus depots, and ferry terminals and earn a percentage of their fares

through such trips; (ii) statistical evidence that Uber drivers sometimes transport passengers

interstate and earn a percentage of their fares through such interstate trips; and (iii) evidence that

Uber seeks individuals with interstate transportation experience for the driver role and partners

with airlines, airports, and cities to facilitate the flow of interstate commerce. Dkt. No. 44 at 19.

First, the fact that Uber drivers occasionally transport passengers intrastate to interstate

transportation hubs does not suffice to place them within the ambit of Section 1's residual clause.

In reaching this conclusion, the Court is informed by the Supreme Court's decision in *United

States v. Yellow Cab Co.*, 332 U.S. 218, 222 (1947).  In that case, the Court addressed whether a

cab company that transported passengers and their luggage "between railroad stations in

Chicago, pursuant to [exclusive] contracts with railroads and railroad terminal associations" was

part of the stream of interstate commerce for purposes of the application of the Sherman Act.  *Id.*

at 221–25.  After noting that the Sherman Act applied "if some appreciable part of interstate commerce" was involved, *id.* at 225, the Court held that the cab company was part of the stream of commerce for purposes of the antitrust law.  *Id.* at 228.  Specifically, the Court noted that "[w]hen persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character."  *Id.* at 228–29.

By contrast, the Court held that "when local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation."  *Id.* at 233.  The Court stated:

> Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination.  What happens prior or subsequent to that rail journey, *at least in the absence of some special arrangement*, is not a constituent part of the interstate movement.  The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance.  Taxicab service is thus but one of many that may be used.  It is contracted for independently of the railroad journey and may be utilized whenever the traveler so desires.  From the standpoints of time and continuity, the taxicab trip may be quite distinct and separate from the interstate journey.  To the taxicab driver, it is just another local fare.

*Id.* at 231–33 (emphasis added).

*Yellow Cab* forecloses Plaintiff's argument that the mere occasional picking up and dropping off passengers at transportation hubs such as airports or train stations is enough for Uber drivers to be "engaged in . . . interstate commerce."  9 U.S.C. § 1.  The fact that an Uber driver might occasionally make an intrastate trip to an interstate transportation hub *alone* is not sufficient for Uber drivers to be covered by Section 1's residual clause.  Uber drivers are much

more like the local taxicabs in *Yellow Cab* than the cab company that had exclusive contracts

with the railroads.  Like the local taxi drivers in *Yellow Cab*, Uber drivers conduct an

independent local service and sometimes "convey interstate train passengers between their

homes and" these transportation hubs "in the normal course of their independent local service."

*Id.* at 231–33.  If, for purposes of train transportation, the "common understanding" is that the

interstate trip begins once the passenger arrives at the rail station and not before (absent a special

relationship between the rail station and the taxi company), the common understanding must also

be that the interstate trip for plane transportation begins at the airport and not before.  Passengers

have numerous ways of arriving at the airport—by train, by bus, by yellow taxicab, by personal

car, or by Uber.  By the same token, the service the Uber driver performs is identical regardless

of the passenger's ultimate destination.  From her perspective, she is indifferent as to whether the

passenger wants a lift to the airport, a train, a bus station, or to some purely local destination.

She will perform the same service in the same way.  Indeed, the driver might be entirely ignorant

as to the nature of the trip until shortly before it begins.  The rider contracts with the Uber driver

directly and separately from the source of her interstate travel, exactly like the taxicab rider in

*Yellow Cab*.

Plaintiff also has not identified any "special arrangement" between Uber and these

airports, train stations, and other modes of interstate travel that would make Uber drivers more

similar to the cab drivers in *Yellow Cab* who transported passengers and luggage between

railroad stations pursuant to a contract with the railroads.  Where, for example, a company is

engaged in a business to "serve[] only [airport] passengers" or has an arrangement that the fares

it receives will be shared with an airline or augmented by the fare that the airline is paid, it might

make sense to say that the Uber driver is "engaged in interstate commerce."  *See Yellow Cab Co.*,

332 U.S. at 231.  Where a car company and an airline have a revenue-sharing agreement, it might be said that the car company is part of the stream of interstate commerce—the trip by car and the trip by plane would not be contracted for independently and the car trip would not be "distinct and separate from the interstate journey." *Id.* at 232.  There is no such evidence here. While Plaintiff claims that Uber partners with airlines, airports, and cities to facilitate the flow of interstate commerce, the only evidence Plaintiff offers in support of this claim is that Uber has partnered with "most major U.S. airports . . . to allow the use of [the Uber] platform within airport boundaries," Dkt. No. 44 at 7 & n.11, and allows riders to preschedule a ride to the airport, *id.* at 7 & n.12.  But, this type of evidence is wholly different from the type of special arrangement which *Yellow Cab* held may result in a cab service being part of the stream of interstate commerce.  At most, it establishes that Uber has contracted for the right and ability to pick passengers up or drop them off at the airport.  It does not establish that Uber drivers are engaged in interstate commerce any more than the fact that an airport may have a dedicated space for yellow cabs to pick up passengers suggests that these yellow cab drivers are engaged in interstate commerce.  It also does not establish that an airline or airport has an interest in Uber's business such that the Uber ride can be considered part of a continuous whole with the airplane flight.  The passenger who alights at LaGuardia, Newark, or Kennedy airports in the New York City area makes an independent decision upon arrival how to get to his or her destination. Moreover, Uber appears to allow its customers to preschedule a ride *anywhere*, not just from or to airports.  This evidence thus does not establish the type of "practical, economic continuity" required to transform purely intrastate trips into trips that are part of the flow of interstate commerce.  *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974); *Osvatics*, 535 F.

Supp. 3d at 21 ("[T]here must be an established link between such intrastate rideshare trips and the channels of commerce that are designed to facilitate passengers' interstate journeys.").

In a case such as this, in which under *Yellow Cab*, Uber drivers would not be considered to "affect[]" interstate commerce under the Sherman Act, such drivers are also not "'engaged in . . . interstate commerce' under section 1 of the FAA." *Cunningham*, 17 F.4th at 251 (citations omitted). The Sherman Act, as stated by the Court in *Yellow Cab*, "outlaws unreasonable restraints on interstate commerce, *regardless of the amount of the commerce affected*." 332 U.S. at 225 (emphasis added). Section 1 of the FAA, by contrast, applies only to those workers "engaged in commerce"—a term of art which does not "regulate to the outer limits of authority under the Commerce Clause." *Cir. City Stores, Inc.*, 532 U.S. at 115–16. "Hence, conduct that does not affect interstate commerce under the Sherman Act (*e.g.*, local cab rides to the station) would seem *a fortiori* not to be conduct 'engaged in interstate commerce' under the FAA's section 1 exception." *Cunningham*, 17 F.4th at 251.

This holding is consistent with decisions of other courts holding that last-leg Amazon delivery drivers are exempt from the FAA under Section 1. *See Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 908 (9th Cir. 2020); *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10 (1st Cir. 2020). Those cases focus on the fact that an essential aspect of Amazon's business model is delivering goods worldwide and interstate and Amazon specifically contracts with its last-leg delivery drivers to carry out an essential chain in that foreign or interstate delivery. Thus, "AmFlex drivers' transportation of goods wholly within a state are still a part of a continuous interstate transportation, and those drivers are engaged in interstate commerce for § 1's purposes." *Rittmann*, 971 F.3d at 916. In this case, Plaintiff identifies no such contractual relationship

between Uber and an interstate transportation service provider—*e.g.*, an airline, railroad, or seaport—and thus the same reasoning does not apply.

The Supreme Court's decision in *Saxon* is also not to the contrary.  In that case, the plaintiff worked for Southwest Airlines and the Court stated that "one who loads cargo on a plane bound for interstate transit is intimately involved with the commerce (*e.g.*, transportation) of that cargo" and "there could be no doubt that interstate transportation is still in progress, and that a worker is engaged in that transportation."  *Saxon*, 142 S. Ct. at 1790.  Thus, the *Saxon* plaintiff was like the cab drivers with special contractual relationships with the railroads in *Yellow Cab*.  The Supreme Court specifically declined to address whether classes of workers— such as last-leg delivery drivers and food delivery drivers—who carry out "duties further removed from the channels of interstate commerce or the actual crossing of borders" would fall within the residual clause of Section 1.  *Id.* at 1789 n.2.

Plaintiff further argues that the fact that Uber drivers sometimes make interstate trips qualifies them as being engaged in interstate commerce.  The statistical evidence indicates that approximately 2-3% of Uber trips in the United States are interstate and Uber drivers nationally derive anywhere from around 4-11% of their revenue from interstate trips.  Dkt. No. 45-1 at 23– 31.  *Yellow Cab* does not directly address this issue since the local taxicab drivers in that case did not claim to cross state lines.  332 U.S. at 230–31.

The Court concludes that the evidence of interstate trips is insufficient to qualify Uber drivers as being engaged in interstate commerce.  As noted, when determining the scope of the Section 1 residual clause, courts must apply the maxim of *ejusdem generis.  See Cir. City Stores, Inc.*, 532 U.S. at 114–15; *Bissonnette*, 49 F.4th at 660 (applying maximum to hold that transportation workers must work in the "transportation industry").  Under this rule, the phrase

any "other class of workers engaged . . . interstate commerce" must embrace "objects similar in nature to" the words "seamen" and "railroad employees."  9 U.S.C. § 1; *see, e.g.*, *Cir. City Stores, Inc.*, 532 U.S. at 114–15; *Bissonnette*, 49 F.4th at 660.  "Thus, to fall within the scope of the residual clause, the class of workers must 'perform[ ] work analogous to that of seamen and railroad employees.'"  *Osvatics*, 535 F. Supp. 3d at 17 (quoting *Wallace*, 970 F.3d at 802).  The Supreme Court has also stated, in a related context, that "interstate commerce" is an "intensely practical concept drawn from the normal and accepted course of business" and, in determining what falls under it, "common understanding" of certain activities is relevant.  *Yellow Cab Co.*, 332 U.S. at 231–32.

In common parlance, "seamen" and "railroad employees" are the types of workers for which "the interstate movement of goods and passengers over long distances and across national or state lines is" considered "an indelible and 'central part of the job description.'"  *Capriole*, 7 F.4th at 865 (quoting *Wallace*, 970 F.3d at 803); *see Cunningham*, 17 F.4th at 253 ("In section 1, those enumerated objects are 'seamen' and 'railroad employees,' two classes of transportation workers primarily devoted to the movement of goods and people beyond state boundaries."); *Osvatics*, 535 F. Supp. 3d at 17 (noting that seamen and railroad employees' occupations "are centered on the transport of goods [or persons] in interstate or foreign commerce").  While there are certainly some seamen and railroad workers who transport goods or people solely intrastate, trains and boats are characterized by the fact that they carry people long distances, including between states and countries.  In fact, at the time that the FAA was enacted in 1925, trains and boats were presumably two of the chief methods of traveling in interstate and foreign commerce.

Interstate travel, however, is not a central or indelible feature of Uber drivers' jobs, unlike that of seamen and railroad employees.  Although it is undoubtedly true that Uber drivers occasionally transport people across state lines, the evidence in the record supports that such trips are not a central or inherent part of their job.  The vast majority of Uber trips are local and the average Uber trip is very short.  Nationally, only approximately 2% of Uber rides are interstate, Dkt. No. 45-1 at 23–25, and only about 5% of gross fares for Uber drivers are derived from instate travel, Dkt. No. 45-1 at 31.  Between January 1, 2018 and December 31, 2020, the average Uber trip covered a distance of 6.3 miles and took 15.6 minutes to complete.  Dkt. No. 22-4 ¶ 4.  Similarly, Plaintiff's average trip was approximately six miles and approximately nineteen minutes long.  *Id.* ¶ 5.  It appears to be an accident of geography—*i.e.*, the proximity of a certain city to the border of another state—that some Uber trips cross state lines rather than of deliberate plan or job description.  *See Capriole*, 7 F.4th at 864 ("Interstate trips that occur by happenstance of geography do not alter the intrastate transportation function performed by the class of workers." (citation omitted)).

While even a small number of interstate trips may be sufficient to satisfy Section 1's residual clause in the presence of evidence that these trips are an expected and required part of the job, there is no such evidence here.  Plaintiff presents no evidence that interstate travel is a part of an Uber driver's job description or that Uber drivers view interstate trips as much more than "another local fare"—albeit with a potentially higher gross pay by virtue either of the distance traveled or a toll that might be reimbursed.  There is no evidence that Uber requires its drivers to accept interstate trips as a condition of being able to accept rides through the Uber application.  As the evidence shows, Uber's advertisement and marketing materials do not address interstate trips, Dkt. No. 45-1 at 12, nor is there any evidence that Uber attempts to hold

itself out as a method of getting from state-to-state.  Uber also does not maintain any guidelines, policies, or practices applicable to drivers that concern interstate trips.  *Id.* at 14.  In fact, interstate trips, if anything, appear to be discouraged as riders, for example, who take trips between New York City and New Jersey incur a surcharge.  Dkt. No. 43 at 7–8; Dkt. No. 43-1.  The "common understanding" of the job of an Uber driver also does not support that they are engaged in interstate travel in the same way as a railroad employee or a seaman.  *Yellow Cab Co.*, 332 U.S. at 231–32.  One is much more likely to think of Uber as a substitute for a local cab service than as a substitute for a bus, train, or airplane—key forms of interstate travel.

The evidence in this record that Uber drivers occasionally cross state lines alone cannot make an Uber driver—who primarily engages in short, local travel—similar in kind to a train worker or a seaman.  Indeed, if the question of whether a class of employees were engaged in interstate commerce turned solely on the number of trips that crossed state lines, the determination of whether the Section 1 residual clause applied and thus whether a particular claim could be litigated or would be subject to arbitration could fluctuate from year to year.  In some years (for example, when ridership and interstate travel was reduced due to a recession or a national health crisis), there might be few such trips.  In other years (say, during a booming economy or an airline-pilot strike), the number of trips might dramatically increase.  The question of whether the employee was engaged in interstate commerce and whether the dispute was subject to arbitration might turn on the time frame over which the data is analyzed.  Neither the employee nor the employer could know for sure in advance of the issue being litigated, let alone at the time of contracting, the forum in which disputes between the two would be resolved.  Such a result would "undermine[] the certainty and predictability which arbitration agreements are meant to foster."  *Menorah Ins. Co. v. INX Reinsurance Corp.*, 72 F.3d 218, 223 (1st Cir.

1995); *see Osvatics*, 535 F. Supp. 3d at 16; *see also Conopco, Inc. v. PARS Ice Cream Co.*, 2013 WL 5549614, at *4 (S.D.N.Y. Sept. 26, 2013) ("Forum selection clauses, after all, 'are enforced because they provide certainty and predictability in the resolution of disputes.'" (citation omitted)).

In addition, although Plaintiff claims that the "Uber 'job description' for the driver role confirms that experience in interstate transport is a key qualification for the position," the underlying evidence does not support the claim. Dkt. No. 44 at 7. The job description that Plaintiff identifies states the following:

> If you have previous employment experience in transportation (such as a delivery driver, driver, professional driver, driving job, truck driver, heavy and tractor-trailer driver, cdl truck driver, class a or class b driver, local truck driver, company truck driver, taxi driver, taxi chauffeur, cab driver, cab chauffeur, taxi cab driver, transit bus driver, bus driver, coach bus driver, bus operator, shuttle driver, bus chauffeur) you might also consider driving with Uber and earn extra money.

Dkt. No. 45-2. This job description does not include the word "interstate" or any similar phrase. Nor does the job criteria list any jobs that are inherently interstate—even the job of truck driver or heavy and tractor-trailer driver may be purely intrastate. Rather, the key qualification is that that the prospective Uber driver must have experience in "transportation," driving a vehicle for pay, not "experience in interstate transport." Dkt. No. 44 at 7.

The Court thus concludes that the evidence does not show that Uber drivers are "engaged in foreign or interstate commerce" and Plaintiff's claims are therefore not exempt from arbitration under the FAA. 9 U.S.C. § 1. This Court is informed in its conclusion that interstate travel must be central to the transportation worker's job to fall under Section 1 by the Supreme Court's decision in *Yellow Cab*. As is evident from *Yellow Cab,* the relevant criteria for determining whether a transportation worker operates in interstate commerce is not what underlying activity she performs (in that case, both cab drivers transported passengers to and

from railroad stations), nor is it how often she performs such an activity.  In fact, the Supreme

Court did not even inquire in *Yellow Cab* how often the local taxicab drivers took passengers to

and from the railroad stations.  Instead, *Yellow Cab* specifies that the key inquiry is whether

interstate activity is other than a merely "casual and incidental" part of the employee's job

responsibilities.  332 U.S. at 231–32.  Here, Plaintiff has presented no evidence that interstate

activity is anything other than a casual and incidental feature of the otherwise largely local

services that he provides.

      While the Court's holding in this case is in line with the majority of courts to address this

issue, the Court recognizes that its opinion is in tension with the Seventh Circuit's holding in

*Int'l Bhd. Of Teamsters Loc. Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 955 (7th Cir.

2012).  In *Kienstra Precast,* the Seventh Circuit held that Section 1 applied to a trucking

company that only made a small number of interstate deliveries, concluding that "there is no

basis in the text of § 1 for drawing a line between workers who do a lot of interstate

transportation work and those who cross state lines only rarely" and "both sorts of worker are

'engaged in foreign or interstate commerce.'"  702 F.3d at 958 (citation omitted).  *Kienstra*

*Precast* is, in part, distinguishable as it did not involve a rideshare company and because the

Seventh Circuit was addressing the applicability of Section 1 to a trucking company—arguably a

business that is more often associated with interstate than intrastate commerce.  To the extent it

is not so distinguishable, the Seventh Circuit's reasoning appears to be contrary to the Supreme

Court's guidance in *Circuit City* that the residual clause calls for application of the "maxim

*ejusdem generis*, under which the residual clause should be read to give effect to the terms

'seamen' and 'railroad employees,' and should be controlled and defined by reference to those

terms."  532 U.S. at 106.

The Court's decision is also in tension with the holdings of other courts in this District, which held that rideshare drivers are exempt from the FAA under the residual clause in Section 1.  *See, e.g.*, *Islam*, 524 F. Supp. 3d at 356; *Haider*, 2021 WL 1226442, at *5.  However, those opinions involve Lyft and the factual records in those cases were more extensive than and different from the factual record that Plaintiff has offered in this case.  *See, e.g.*, *Islam*, 524 F. Supp. 3d at 356; *Haider*, 2021 WL 1226442, at *5.  For example, in *Haider*, the evidence showed that "Lyft's corporate disclosures reflect marketing partnerships with airlines and hotels," Lyft "offers riders priority pick-ups at airports with a paid subscription, and Lyft has "'worked to integrate its transportation services' with at least one air carrier."  2021 WL 1226442, at *4 (citation omitted).  Similarly, in *Haider*, there was evidence that "Lyft has 'worked to integrate its transportation services with Delta Airlines,' allowing passengers to book Lyft rides through the Delta app and to pay for the rides using Delta SkyMiles."  524 F. Supp. 3d at 348.  In the case at hand, Plaintiff has offered no such evidence of any special commercial arrangement between Uber and any airline or hotel.

The Court thus concludes that Plaintiff's claims are subject to the FAA and the Court grants Uber's request to compel individual arbitration of Plaintiff's claims.

## II.      Staying Plaintiff's Claims

Uber asks this Court to dismiss Plaintiff's claims upon compelling individual arbitration.  Dkt. No. 22 at 1.  Plaintiff does not address this request in their opposition to Uber's motion to compel.

In *Katz v. Cellco Partnership*, the Second Circuit addressed when a stay versus dismissal of an action is warranted after a district court compels arbitration pursuant to a binding arbitration agreement between the parties.  794 F.3d 341 (2d Cir. 2015).  In that case, the district court, after compelling arbitration of all claims, "dismissed—rather than stayed—the action, but

recognized that whether district courts have such dismissal discretion remains an open question in this Circuit." *Id.* at 344.  The Second Circuit vacated the dismissal and remanded with instructions for the district court to stay the action, *id.* at 343, and held that it would "join those Circuits that consider a stay of proceedings necessary after all claims have been referred to arbitration and a stay requested," *id.* at 345.  The Second Circuit noted that such a result was required by the "FAA's text, structure, and underlying policy command"; the FAA provides that a court "*shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." *Id.* at 345 (quoting 9 U.S.C. § 3 (emphasis added)).  The Second Circuit further reasoned that "[a] stay enables parties to proceed to arbitration directly, unencumbered by the uncertainty and expense of additional litigation, and generally precludes judicial interference until there is a final award." *Id.* at 345.  The Second Circuit also stated that "the FAA explicitly denies the right to an immediate appeal from an interlocutory order that compels arbitration or stays proceedings." *Id.* at 356.  The court noted: "The dismissal of an arbitrable matter that properly should have been stayed effectively converts an otherwise-unappealable interlocutory stay order into an appealable final dismissal order" and thus would "[afford] judges such discretion . . . to confer appellate rights expressly proscribed by Congress." *Id.*

More recently, the Second Circuit in *Bissonnette* affirmed the district court's order compelling arbitration and dismissing the case.  49 F.4th at 663.  Judge Jacobs, who wrote the opinion in *Bissonnette*, filed a separate concurrence to discuss a district court's decision to dismiss or stay a case after claims are compelled to arbitration.  *See id.* at 663 (Jacobs, J., concurring).  Judge Jacobs wrote that while *Katz* held that a stay was mandatory where a stay was requested by one of the parties, "*Katz* can be read to mean that, when no stay is requested,"

as was the case in *Bissonnette*, "the district court retains discretion to stay the case or dismiss it." *Id.* at 664.   Judge Jacobs then, however, stated that such a reading was not consistent with the FAA, which "requires a court that enforces" an arbitration clause to "stay proceedings in the interim."   *Id.* at 664–65.   In support of this position, he noted that while the FAA states that a court "shall on application of one of the parties stay the trial of the action," "[r]ead naturally and in context, the referenced 'application of one of the parties' is the application to enforce the arbitration clause," not a separate request for a stay. *Id.* at 665 (quoting 9 U.S.C. § 3).   He also noted that such an approach is "consistent with the FAA's pro-arbitration posture" and with the "FAA provision governing appeals."   *Id.*   If dismissal is entered, a party has a right to immediate appeal of an order compelling arbitration, which would impede the expeditious resolution of the arbitral proceeding.   *Id.* at 666.   He thus stated that "[i]n short, the stay of a suit pending arbitration is (in my view) arguably compelled and certainly prudent."   *Id.* at 667.

In the present case, neither party has requested a stay and so *Katz* does not squarely address the issue.   Nonetheless, the Court exercises its discretion to stay the current proceedings. *See Zambrano v. Strategic Delivery Sols.*, *LLC*, 2016 WL 5339552, at *10 (S.D.N.Y. Sept. 22, 2016) ("[B]ecause Defendants seek dismissal rather than a stay, this Court has discretion whether to stay or dismiss Plaintiffs' action under the FAA." (citation omitted)).   This approach is consistent with Congress's intent to "move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible" as well as comports with the FAA's statutory scheme.   *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983).   The opportunity for a final answer as to whether claims of Uber drivers fall within the residual clause will not be frustrated by a stay in this case.   As noted, *supra* p. 14 n.2, the issue is currently before the Second Circuit.   "A stay would also allow the Court, at a later stage, to address any

claim by Plaintiff[] that [he was] not able to vindicate all [his] statutory rights due to costs or fees imposed on [him] in arbitration." *Zambrano*, 2016 WL 5339552, at *10.  The Court thus stays the action pending arbitration.  *See China Media Express Holdings, Inc. by Barth v. Nexus Exec. Risks, Ltd.*, 182 F. Supp. 3d 42, 53 (S.D.N.Y. 2016) (granting stay even though it was not requested by either party); *Merrick v. UnitedHealth Grp. Inc.*, 127 F. Supp. 3d 138, 154 (S.D.N.Y. 2015) (staying case even though there was no request for a stay after finding that the Circuit's logic in *Katz* "applies with equal force to the present situation").

## CONCLUSION

The motion to compel individual arbitration is GRANTED and the claims brought by Plaintiff against Uber are STAYED pending arbitration.[6]


SO ORDERED.

Dated: December 21, 2022
    New York, New York                                    _____
                                                              LEWIS J. LIMAN
                                                         United States District Judge

---

[6] Because the Court finds that Plaintiff must arbitrate his dispute under the FAA, the Court does not address Defendant's alternate argument that he is compelled to arbitrate his claims under New York law.  Dkt. No. 43 at 9.